James E. MARSH, Appellant,

v.

Patricia R. HARRIS, Secretary of
Health, Education &
Welfare, Appellee.

No. 79–1861.

United States Court of Appeals,
Fourth Circuit.

Argued June 2, 1980.

Decided Sept. 18, 1980.

Barbara Davis, Legal Aid Service of the Buncombe County Bar Ass'n, Inc., Asheville, N. C., for appellant.

Bill W. Bourland, Sp. Asst. U. S. Atty. (Harold M. Edwards, U. S. Atty., Asheville, N. C., on brief), for appellee.

Before PHILLIPS and SPROUSE, Circuit Judges, and KIDD *, District Judge.

* Honorable William Matthew Kidd, United States District Judge for the Southern District of West Virginia, sitting by designation.

SPROUSE, Circuit Judge:

This is an appeal by James E. Marsh from the judgment of the district court affirming the decision of the Secretary of Health, Education, and Welfare denying him social security disability benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423, 1382. Marsh was initially awarded disability benefits in 1973, effective from 1971, due to epilepsy. His original period of disability ended in August, 1977, due to his attempt to reenter the labor market at that time. The present proceedings were initiated by a new application for disability and supplemental security income; the application was denied. A hearing was held by an administrative law judge (ALJ) who, on December 18, 1978, found Marsh not disabled. This decision was approved by the appeals council and affirmed by the district court.

Marsh is 55 years of age. He was raised on his grandfather's farm. Compelled by his grandfather to terminate his schooling to work on the farm after completing only two months in the first grade, he is illiterate. He lives with his wife and has two adult children. He is 5 feet 7 inches tall and weighs 150 pounds. Prior to his first disability award in 1971, he worked at numerous semi–skilled jobs—as a machine operator in a cotton mill, as a sander in a furniture company, as an attendant at a gasoline station, as a carpenter for a construction company, and as a welder. Marsh testified that he was able to hide the fact that he was afflicted with epilepsy during most of his working career, but that after he attempted to return to work in 1977 it was generally known that he was an epileptic. Prospective employers, after checking with past employers, thus refused him employment.

The record contains seven medical reports from different doctors. The first is a 1972 report from a social services doctor whose diagnosis was hypertension, an infected kidney, and suspected epilepsy. When Marsh was hospitalized in 1973 the treating physician noted that he was an epileptic. In 1973, a neurosurgeon reported that Marsh had a long history of epilepsy in which he had had blackouts, chewed his tongue, and trembled; his report indicates that the attacks occurred approximately two to three weeks apart. The other medical reports also indicated a continuing epileptic condition.

Since 1952, Marsh has been on various medications for his epileptic condition: Dramamine, Pro–Banthine, Dilantin, Benadryl, Phenobarbital, Carbrital, Valium, and Serapes. He testified that the medication affects him adversely, including making it difficult for him to speak, but his testimony was unclear as to the total effect of the medication. He said it was necessary that the doctors "strenghened [sic] up on it . . at the time being I rested good at night. But now it's got to where I think I'm gonna have to go back and get it straightened up again so I can rest."

In 1973, he underwent a brain scan and electroencephalogram (EEG). The EEG showed a normal frequency and normal amplitude of the brain waves, without seizures or abnormalities. Dr. May, the treating physician, has seen Marsh at the Hamlet Hospital at various times since 1964 for epilepsy and other conditions; Marsh has also been hospitalized for dysphagia (difficulty in swallowing). In Dr. May's opinion, Marsh was totally unable to work due to his epileptic condition.

Marsh testified at the hearing that his main problem was with "blackout spells," two of which had occurred during the month of the hearing. The ALJ asked him how many he had had so far that year, and he answered:

I don't know. I don't know–sometime I get every mornin'–If I get up in a hurry, you know, be on the bed and jump up like that there (indicating) like I'm gonna get up right in a hurry, or somethin' that makes a person—

—you've done it, I know,–I have realized everybody's done it in here–get up in a hurry–everything will turn just as dark to me and I'll just get right back up on the bed and I'll have to lay there and hold

my head for a while before I can ever get up so I can walk.

He described some of the blackouts, in which he sometimes fell, striking his face and, on occasion, causing nose bleeds. He drove a car to the hearing but brought his wife along in the event of a seizure. He concealed his epileptic condition when he obtained his driver's license, because he needed the license in order to travel to jobs. He testified:

But, I've been so sick and my head was so swimmy that—that's the reason I brought my wife with me this mornin', so if somethin' was to happen with me, she can take over and drive for me.

Marsh said the attacks were occurring with increasing frequency. He said that after an attack his tongue, neck, and throat are sore. He has no teeth, but after biting his tongue during an attack he can hardly drink water. He also testified that he urinates uncontrollably during attacks, making it necessary to change clothes. At the time of the hearing he was seeing Dr. May one to three times a month, but Marsh testified that he had not had further testing because he could not afford it. He performs some light household duties while his wife works, such as dusting, sweeping, and "straighten the cover" on the beds. He washes dishes once in a while, but he cannot perform the chore of grocery shopping. He was asked:

Q. . . . Do you have any difficulty using tableware like a knife, and fork, and cup and saucer and spoon?

He answered:

A. You mean without droppin' it? Well, yes, I can use a little bit, but I've dropped several of 'em too and busted glasses tryin' to get me a glass of water. I've dropped a heap of 'em there. It's just the cramps in my hands—and I'll drop a glass and bust it, and then I'll have to go get me another one.

He was asked if he mowed the yard:

A. I mowed it one time—two or three months it was—I got to where I could mow the yard one time. And them— And then it took me about 2 hours to mow a little trailer lot yard. I mowed that a little while and set down.

It's about 30 feet wide, I reckon, and about 40 foot long. No, about 20 feet wide and about 40 feet long. I'd say somewhere's about like that.

Marsh's wife testified to his having seizures for a number of years but didn't think they were as bad now as previously, although she could not testify as to the frequency because "they scars [sic] me whenever he has them and I try to put it out of my mind, you know, as quick as I can so I won't have to remember about them." She said that he was "sometimes 2–3 months without one" but "and then he'll have 'em, you know, maybe 2–3 right regular." She corroborated Marsh's testimony concerning the nature of the seizures. Mrs. Marsh also testified that her husband concealed the attacks from her.

The other evidence at the hearing consisted of the testimony of a vocational expert who answered hypothetical questions based on the assumption that Marsh's testimony concerning his impairment was correct. The expert's opinion was that he could not perform any work existing in the national economy. The ALJ then posed a different hypothetical question to the expert which included assumptions not fully supported by the evidence: "that I might find he can use his hands for simple grasping, pushing and pulling and fine manipulation . . . and that he would have the capacity to bend forward from a seated position over a table or a bench . . . (excluding) movement of the head over a range . . . from standing to bending down at the waist . . . that the claimant would have the capacity to remain seated for the necessary time to conclude or to cover a normal work day . . . that although he would have symptoms of pain these would not be so distracting that they would prevent him from doing the various functions I've described to you . . . that the claimant would have a blackout occurring without substantial warning at the rate of once a month." The expert concluded that if such were true, there were stated jobs Marsh could perform.

Marsh was not represented by counsel at the hearing. He was asked about this initially:

A. Well, I don't have the money to hire an attorney with and I'll try to tell the truth as far as I know how. Well, I'll try to present it myself as near as I know how.

ALJ. Really, that's–that's fine. Really, most people–I think the majority of people prefer to have it that way, but I like to talk to each claimant on the basis of–of what they're [sic] wishes are.

Incidentally, you mentioned that you didn't have funds to hire an attorney.

If you were to wish to have somebody, the legal aid society provides some assistance . . . .

Have you thought about that or not?

A. No, sir, nobody had said nothing to me about no attorney or nothin'.

Marsh contends on appeal that there is no substantial evidence supporting the denial of disability, that the Secretary failed to properly evaluate the evidence of pain, that the ALJ improperly framed hypothetical questions to the vocational expert, and that the ALJ failed in his duty to properly develop a record. He contends, finally, that he was prejudiced by the lack of legal representation at the hearing and that he did not receive a fair hearing.

Assuming the record to be properly developed, there may have been substantial evidence to sustain the Secretary's finding. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Laws v. Celebrezze*, 368 F.2d 640 (4th Cir. 1966); *Lewis v. Celebrezze*, 359 F.2d 398 (4th Cir. 1966). A review of the record, however, reveals a number of areas where evidence should have been more completely developed.

The principal ailment contributing to Marsh's inability to work was diagnosed as "grand mal epilepsy." Disabling epilepsy is defined in 20 C.F.R. § 404.1506 (Subpart P, App. 1 § 11.02) (1979):

major motor seizures, (grand mal or psychomotor) . . . occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With: A. Diurnal episodes . . . or B. nocturnal episodes [which show residual interference] manifesting residuals which interfere significantly with activity during the day.

The regulation also requires major motor seizures occurring more than once a month to be substantiated by evidence of diurnal or nocturnal episodes plus an EEG. Marsh's last EEG was performed in 1973, some five years prior to the hearing.

■ The ALJ is required by 20 C.F.R. § 404.927 (1979) to inquire fully into each issue. He is held to a high standard in discharging this fact–finding requirement. *Snyder v. Ribicoff*, 307 F.2d 518 (4th Cir. 1962), *cert. denied sub nom. Heath v. Celebrezze*, 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963). The performance of this duty is particularly important when a claimant appears without the assistance of counsel. Under such circumstances, the ALJ should "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," *Gold v. Secretary of Health, Education and Welfare*, 463 F.2d 38, 43 (2nd Cir. 1972), being "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Rosa v. Weinberger*, 381 F.Supp. 377, 381 (E.D.N. Y.1974).

Marsh was completely unschooled on the requirements for proving his case. His testimony provided sketchy evidence concerning nocturnal episodes resulting from his epileptic condition, he was completely unaware of any necessity for a recent EEG, and he furnished incomplete information about his ability to perform household chores, the number and frequency of attacks, and the effects of his medication. The ALJ was no doubt intimately familiar with the regulations concerning proof of an epileptic disability. He should have recognized the importance of this evidence and more fully developed it.

The ALJ also breached his promise to Marsh to obtain further evidence from Dr. May, the treating physician. He noted un-

**300**

successful attempts to contact Dr. May in his decision but, nevertheless, deemed it appropriate to close the record without this evidence because he had been unable to talk with Dr. May during a two–month period. Not only did Marsh rely on the ALJ to obtain this testimony, but if obtained it might well have contributed to a proper ALJ decision.

■ Although Marsh was not represented by counsel, this is not in itself reason to upset the Secretary's decision, for the Secretary has no duty to insist that claimant have counsel. *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857 (7th Cir. 1978). See, however, *Cullison v. Califano*, 613 F.2d 55 at 58 (4th Cir. 1980), wherein Judge Hall, writing for this Court, said:

We decline to create a rule to require the Secretary to give special notice to claimants that they should retain counsel, anytime his review of the evidence shows some degree of mental or emotional disability. *Cf. Sellars v. HEW*, 458 F.2d 984, 985–86 (8th Cir. 1972), *citing* 20 C.F.R. § 404.927; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). However, we think that, consistent with the purpose of the truth–finding claims procedure created by Congress for the compensation of bona fide disabilities, the Secretary's rules and the conduct of various adjudicatory proceedings–before the Secretary and on judicial review–must take special account of any impairment which can effectively disable a claimant from substantiating her claim–whether it arises by claimant's inability to submit to a medical treatment, her testimonial declarations or her failing attempts at self–preservation (citations omitted).

■ The way in which Marsh was informed that he could be represented by counsel is at least questionable. His illiteracy and his obvious lack of understanding of the evidence necessary to develop the critical issues were compounded by the absence of legal representation. Competent counsel could have obtained testimony from Dr. May and secured all relevant hospital records. He could have developed information concerning the combined effects of medication, the number and frequency of seizures, and the nocturnal aspects of the seizures. Competent counsel would have acquired an EEG prior to the hearing. There certainly would have been an objection to framing the hypothetical question on incomplete evidence. *Wroblewski v. Califano*, 609 F.2d 908 (8th Cir. 1979). The conclusion is inescapable that, unassisted, Marsh was unable to present his case adequately. This should have been obvious to the ALJ, who failed to elicit the available evidence.

Where the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded. *Cutler v. Weinberger*, 516 F.2d 1282 (2nd Cir. 1975); *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837 (3rd Cir. 1974); *Hicks v. Mathews*, 424 F.Supp. 8 (D.Md.1976).

We reverse and remand to the district court with instructions to remand to the Secretary for a complete development of the record consistent with the views expressed in this opinion.

REVERSED AND REMANDED.