Willie F. **BALLARD**, Plaintiff,

v.

Otis R. **BOWEN**, M.D., Secretary, Department of Health and Human Services, Defendant.

Civ. A. No. 87–0790–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 12, 1988.

Dallas Mathis, Arlington, Va., for plaintiff.

Paula Newett, Asst. U.S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is an appeal from a denial of Social Security disability benefits. It presents the question whether substantial evidence exists to support the Secretary's determination that the claimant, Willie Ballard, is not disabled as defined by the Social Security Act (SSA) and therefore not entitled to disability benefits. As is the practice in this division, this matter was referred to the Magistrate for a report and recommendation. *See* 28 U.S.C. § 636. The Magistrate concluded that the Secretary's decision was not based on substantial evidence and recommended remanding the case. The Secretary filed a timely objection to the Magistrate's report as required by Fed. R.Civ.P. 72(b), and this matter is now ripe for disposition. For the reasons set forth in this Memorandum Opinion, the Court adopts the Magistrate's recommendation, reverses the Secretary's determination, and remands this case to the Secretary for further proceedings consistent with this Memorandum Opinion.

## BACKGROUND [1]

A. Procedural History

In October 1984, plaintiff was shot in his abdominal area. (R. 53). As a result of plaintiff's injury, his left leg was amputated midway between his knee and hip. On November 19, 1984, plaintiff applied for disability insurance and Supplemental Security Insurance (SSI) pursuant to Titles II and XVI of the Social Security Act, asserting that he became disabled as a result of the gunshot wound and amputation. Plaintiff's applications were rejected on January 28, 1985. (R. 15; 145). He filed for reconsideration and was again denied benefits on February 14, 1985. (R. 132–33; 148–49).

Plaintiff thereafter sought a hearing before an administrative law judge (ALJ). The hearing was held June 17, 1985. The only witnesses at the hearing were plaintiff

1. References to the Record are hereinafter referred to as "R."

and Raymond Richman, a vocational expert. On September 11, 1985, the ALJ denied plaintiff's claims, finding that plaintiff could perform a number of sedentary and light level jobs such as a garden inspector, hand trimmer, and napper tender, and that such jobs were available in the national economy. (R. 251). Plaintiff did not appeal that decision.

Plaintiff reapplied for benefits on March 12, 1986, and a second hearing was held before an ALJ on December 9, 1986. Appearing as witnesses at the hearing were plaintiff, his fiancee, Helen Farmer, and Dr. Thomas Baldwin, a vocational expert.[2] On March 26, 1987, plaintiff's applications were again denied, as the ALJ found that plaintiff could perform a full range of sedentary work, such as patcher, napper tender, cuff folder, and dowel inspector, and that such jobs are available to plaintiff. (R. 8–15). The Appeals Council declined to review the December 9 decision, which became the final decision of the Secretary. (R. 3–4).

Plaintiff timely filed for review in the United States District Court, and the parties' cross-motions for summary judgment were submitted to a United States Magistrate without oral argument. The Magistrate found that the Secretary's decision was not based on substantial evidence. Specifically, the Magistrate found (i) that plaintiff's asserted need to move around approximately ten minutes every hour could prevent plaintiff from performing any of the jobs listed by the ALJ, and (ii) that plaintiff required appropriate psychological testing to determine whether he suffers from any adjustment disorders and to determine plaintiff's intelligence level.[3] This matter is now before the Court on the Secretary's objections to the Magistrate's report and recommendation.

**2.** In both hearings plaintiff was represented by a paralegal.

**3.** See Mental Retardation and Autism, 20 C.F.R. § 404, Subpart P, App. 1, 12.05(C), which provides:
  The required level of severity for this disorder [mental retardation] is met when ...
  C. A valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or

## B. Factual History

### 1. December 9 Hearing Testimony

Plaintiff was 31 years old at the time of the December 9, 1986 hearing before the ALJ. Plaintiff completed the eighth grade, but left school to help his family pay bills. (R. 74–76). Plaintiff lives alone in a trailer, and a friend pays his rent and electric bills.

Over his 15–year employment history plaintiff worked as a roofer and garbage collector, and, prior to the shooting incident, was a vault carrier for eight years with the same company.[4] (R. 77, 76).

At the December 9 hearing, plaintiff testified that he suffers from pain in the stump of his amputated leg, but that because he has not paid his medical bills he cannot go back to his local clinic at Chapel Hill for further relief. (R. 80–81). He also complained of pain in his left groin attributable to the poor fit of his prosthesis. Although he received a prosthesis in the spring of 1985, plaintiff continues to walk with crutches because he has balance problems. (R. 82–83). He described his discomfort as constant.

A. I have to constantly move around because I can't sit still too long or stand too long because I've got pain and I have to stand it constantly.

Q. Do you ever have to take it—take your artificial leg off?

A. Yeah, take it off a lot.

(R. 85). The prosthesis did not fit correctly because of swelling in the stump. (R. 85–86). Plaintiff was advised to try to correct the problem by using socks on the stump. (R. 86).

Plaintiff also described psychological problems. Specifically, he told of hearing the voice of his dead girlfriend and being

other mental impairment imposing additional and significant work-related limitation of function [is shown].
  The IQ scores specified in 12.05(C) refer to those obtained on the Wechsler Adult Intelligence Scale (WAIS) test.

**4.** A vault carrier is one who carries coffins to the gravesite.

upset because people were not helping him. Plaintiff was unable to pay the $2.00 visitation fee to continue treatment at a local mental health clinic. (R. 92). He also suffers from diabetes for which he takes insulin. (R. 88–91).

Ms. Helen Farmer, plaintiff's fiancee, testified that plaintiff gets upset, "goes to pieces." (R. 94). When this occurs, she stated, plaintiff sounds as if he is going to cry. (R. 95). She cleans his clothes, cooks and does all of his housework. (R. 97). She said that plaintiff had been driving her to work until she stopped working. (R. 100). Plaintiff only uses his good leg when he drives. (R. 101.)

Dr. Thomas Baldwin, a vocational expert and psychologist, testified at the December 9 hearing. (R. 102). He characterized plaintiff as a young individual with a limited education and heavy exertional level work background. (R. 106). The ALJ asked Dr. Baldwin what jobs might exist for a worker missing a limb whose work level is reduced to light or sedentary, who uses crutches, cannot engage in prolonged standing or walking, climbing or balancing, must be able to sit or stand at will due to pain, and has low average to borderline intelligence and an adjustment disorder in relating to his leg amputation. (R. 106–107). Dr. Baldwin responded that several sedentary and light level jobs such as electrical equipment patcher, napper tender, cuff folder, dowel inspector, or light assembly work [5] could be performed by such a person. (R. 107–109).

To underscore plaintiff's painful condition, however, plaintiff's representative pointed out to the ALJ that, toward the end of the hearing, which had lasted an hour, plaintiff had gotten up and walked around to ease his discomfort. She asked Dr. Baldwin whether the plaintiff's having to move around for ten minutes or so every hour would affect his employability. He answered that it would foreclose plaintiff from performing any of the jobs he had listed:

On that additional condition [plaintiff's having to move around ten minutes per hour] I would have to conclude that none of the jobs would permit an employee to do that where we would be talking about one-sixth of the productive work time. (R. 113). No further questions were asked of the vocational expert regarding plaintiff's asserted need to move around.

2. *Plaintiff's Medical History*

Plaintiff's medical reports document that on October 26, 1984, he was admitted to Wilson Memorial Hospital with no vital signs. He was suffering from a large gaping shotgun wound in the left groin area. (R. 190). He was resuscitated and underwent surgery. Because the major veins and arteries to the left leg were destroyed and plaintiff's kidney's failed, he was transferred to North Carolina Memorial Hospital, University of North Carolina at Chapel Hill.

At North Carolina Memorial, plaintiff's doctors tried to save his leg, but were unsuccessful. On November 2, 1984, his left leg was amputated just above the knee. (R. 207). An abscess developed in the left groin and had to be operated on two weeks later (R. 209). Plaintiff was finally discharged on December 8, 1984.

On March 27, 1985, plaintiff was evaluated for a prosthesis at an amputee clinic. The examining physician reported that plaintiff's leg had a "somewhat large bulbous stump" with a scar on the left groin. (R. 352). On May 8, 1985, plaintiff was seen at an orthopedic clinic. He reported no difficulties and was walking well with crutches. The stump was found to be well healed, but the report indicated that

plaintiff had a prosthetic fitting problem because of the anteromedial invaginated scar in his groin. This area will not provide sufficient padding for the anterior pad of the quadrilateral socket.

(R. 353).

On May 30, 1985, plaintiff was admitted to North Carolina Memorial Hospital for an

---

**5.** These jobs are unskilled assembly-line work requiring the worker to be able to "reach, handle, finger, and feel." (R. 107).

operation for revision of his left groin scar to allow for proper fitting of the prosthesis. (R. 355). After the operation, however, plaintiff continued to complain of stump pain and was seen for the pain at North Carolina Memorial Hospital on February 6, 1986.

On March 5, 1986, plaintiff's vocational rehabilitation counselor, Marilyn Evans, wrote to the orthopedic unit at North Carolina Memorial Hospital expressing concern about plaintiff's complaint of pain when using the prosthesis.

> I am concerned about his present health status and work potential. He continues to have pain with sitting, standing, and walking with little relief when he takes medication.

(R. 381).

She also asked for their prognosis concerning plaintiff's ability to return to work. (Id.) In a note dated March 18, 1986, she was told that the patient had been referred to the brace shop for prothesis adjustment "which should relieve current pain." Plaintiff's work status was deemed "undetermined" at that time. (Id.)

On May 15, 1986, plaintiff was referred by his local Legal Services agency to the North Carolina Division of Mental Health at Wilson, North Carolina, for an assessment. Without performing any intelligence testing, the clinic personnel estimated that plaintiff has low average to borderline intelligence. (R. 366). He was found not to have adjusted well to the loss of his leg and was admitted to outpatient services. (Id.)

A Disability Report Form filled out on June 6, 1986, by the Wilson Mental Health Clinic personnel indicated that plaintiff took two minutes to add 12 plus 16 correctly, but got the wrong answer in adding 17 to 35. Again the clinic administered no standardized tests, but "estimated" plaintiff to be of low average to borderline intelligence, and reported that plaintiff complained of memory loss and poor concentration when trying to read. The clinic reported that plaintiff described incidents of hearing his deceased girlfriend talk to him and feared that people were trying to poison him. (R. 363). They observed that plaintiff "does not appear insightful nor to have the skills to adapt to his physical disability." (Id.) He was found to cry easily and frequently. The report also noted that plaintiff had "difficulty in communicating due to speech impediment from birth." (R. 365). The overall diagnosis was "adjustment disorder with mixed emotional features" and "probable borderline intellectual functioning." Plaintiff's prognosis was "poor due to intellectual and physical impairments." (Id.) The clinic's reports also concluded that "it is doubtful that psychotherapy or medication would have any significant impact." (R. 368).

### 3. ALJ's Determination

The ALJ found that plaintiff's impairments "obviously impose significant restrictions to his ability to perform basic work-related activities" and that "because of his [plaintiff's] pain, he must have the option to sit or stand at will." (R. 13). He also found that these restrictions prevent plaintiff from returning to his former work, thereby shifting the burden to the Secretary to establish that despite these impairments plaintiff retains the capacity to perform some other work activity and that such work exists in the national economy. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir.1981).

To meet that burden, the Secretary called a vocational expert who concluded that plaintiff's impairments do not foreclose his performance of jobs such as patcher, napper tender, cuff folder, and light assembly work. Based upon that vocational evidence, and only on that evidence, the ALJ found plaintiff not disabled.

### 4. Magistrate's Decision

The Magistrate found that the ALJ's determination was not based on substantial evidence because the ALJ failed to consider the vocational expert's further conclusion (in response to plaintiff's representative's questions) to the effect that "none of the jobs" he cited would be available for someone who would have to stop work every hour and walk around or be non-productive

for ten minutes or so. (R. 113). Although there was no evidence in the record that the plaintiff needed ten minutes off every hour, the Magistrate opined that plaintiff "clearly needed some time to move around." (Magistrate's Report at 8). The ALJ failed to ask the expert additional hypotheticals to ascertain precisely how much time off every hour, if any, plaintiff would be given in any of the jobs described in order to relieve pain.

The Magistrate found that the ALJ's decision was also flawed because it accepted, without supporting evidence, the "estimates" of plaintiff's intelligence level. Plaintiff had received no standardized intelligence tests. According to plaintiff's medical records, he was being treated as an outpatient at the Wilson Mental Health Clinic. (R. 362–368). The vocational expert, in discussing the diagnostic axis which should be applied to plaintiff's mental problems, noted "if he (plaintiff) is in fact a borderline intellectual functioning, *and that's not documented....* that is an axis two diagnosis...." (R. 118–119) (emphasis added). There followed a colloquy between the ALJ, plaintiff's paralegal representative and the vocational expert concerning intelligence testing of plaintiff.

> ALJ: Doesn't ... doesn't mental health ... I was kind of surprised to read that mental health report because they generally give an intelligence ... some type of WAIS test, don't they, on intake ...
> ATTY: Wilson is very different in their approach with most severe patients there. Normally in my other five counties when they go into mental health they do on the next visit they do the Wexler. They ... they do all kinds of other testing with them, but Wilson is very different in that they won't and then when our agency tries ... try to help nudge them along, maybe to see what else is going with them, they will bill us for ... and we can't tolerate a $500 bill....

(R. 120). The vocational expert then pointed out that Wilson's records reflect that plaintiff was working with Vocational Rehabilitation (VR):

> Now, it's fairly routine for VR to, particularly a person of this sort who has an unskilled work ... work background, to do psychological testing and I suspect they [Wilson] figured it's probably already been done and it wasn't necessary for them to do it.

(R. 121). Plaintiff's representative told the ALJ that she had been unable to get any such records from vocational rehabilitation. The only document in the file from that agency is the March 5, 1986, letter, described above, expressing concern about plaintiff's pain and problems with his prosthesis, to which the prosthesis experts answered that plaintiff's work status was "undetermined." (R. 381).

The Magistrate found in her report that if any of plaintiff's intelligence tests were to fall below 70, a finding of disability would be required in light of plaintiff's other impairments. 20 C.F.R. § 404, Subpart P, App. 1, 12.05 C.[6] Therefore, the lack of *any* intelligence testing where the claimant's intelligence level is deemed to be in the borderline range, rendered the Secretary's decision "so lacking it must be overturned." (Magistrate's Report at 10).

Moreover, the Magistrate found that there was significant evidence that plaintiff suffers from a severe adjustment disorder. The transcript of the hearing before the ALJ shows a plaintiff who was often incoherent. The ALJ noted in his decision that the plaintiff "appeared agitated and tearful when talking about the shooting incident." (R. 11). The report of Behavioral Manifestations prepared by Wilson Clinic psychiatrist, Dr. Aderhold, and a social worker on June 6, 1986, reports frequent crying, poor concentration, depression, and memory problems. (R. 363). Their prognosis for plaintiff was "poor due to intellectual and physical impairments." (R. 365). They recommended individual therapy for plaintiff focused on acceptance of his physical condition. (R. 367).

Based on the findings set forth above, the Magistrate recommended that the Secretary's decision be reversed and that this

---

6. *See supra* note 3.

action be remanded to the Secretary with directions that the plaintiff receive a complete psychological evaluation, including intelligence testing, as well as a vocational evaluation which adequately considers the impact of pain, psychological problems and a speech impairment on plaintiff's employability. This Court concurs with and accepts the Magistrate's recommendation.

## ANALYSIS

The scope of this Court's review of the Secretary's decision is narrow. The Court must uphold the Secretary's finding of non-disability, even if it disagrees with that finding, if that finding is supported by substantial evidence. 42 U.S.C. § 405(g) (Supp. III 1985); *Pyles v. Bowen*, 849 F.2d 846 (4th Cir.1988). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966)), *quoted in Pyles*, 849 F.2d at 848.

To qualify for SSI benefits, a claimant must show that he or she is "under a disability." 42 U.S.C. § 423(a)(1)(D). "[A]n individual ... shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). Here, the ALJ found that plaintiff was unable to perform his prior work. Therefore the burden shifted to the Secretary to establish that despite his impairments plaintiff retains the capacity to perform other substantial gainful employment that exists in the national economy. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir.1981); *see also Pyles*, 849 F.2d at 848. The Secretary denied benefits finding that plaintiff could perform other jobs such as patcher, napper tender, and light assembly work. The Court holds that there was not substantial evidence to support that finding.

The Secretary's decision is reversed and remanded for further proceedings on two grounds. First, there was not substantial evidence to support the Secretary's finding that plaintiff could perform any of the jobs described by the vocational expert in light of plaintiff's testimony that he is in constant pain and needs to move around frequently. (R. 85). Although this testimony is concededly self-serving, it was not essentially refuted by the medical evidence before the ALJ. *See Hall v. Harris*, 658 F.2d 260, 266 (4th Cir.1981) ("Th[e] concededly self-serving testimony [of claimant] was not essentially refuted by the medical evidence before the ALJ.... The medical evidence, therefore, was completely inconclusive as to whether [claimant] could perform [any work]."); *see also Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir.1987) ("It [is] well-established ... that subjective complaints of pain and physical discomfort [can] give rise to a finding of total disability, even when those complaints [are] not supported fully by objective observable signs.") (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir.1985)). Given the vocational expert's testimony that plaintiff would be unemployable if he required approximately ten minutes of every hour to walk around, the evidence before the ALJ was inconclusive as to whether plaintiff could perform the jobs listed. The record is thus in need of further development: it must be determined whether plaintiff needs time off every hour to walk around because of the pain in his stump and, if so, whether this need would prohibit plaintiff from engaging in any of the jobs described by the vocational expert.

The Secretary's contention that plaintiff had adequate opportunity to present such evidence to the ALJ but failed to do so is without merit. The Fourth Circuit has held that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.1986) (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir.1981); *Marsh v. Harris*, 632 F.2d 296,

300 (4th Cir.1980)). Here, the ALJ had before him (i) plaintiff's uncontradicted testimony that he is in constant pain and must periodically move around to alleviate pain, and (ii) the testimony of the vocational expert that if plaintiff needed to move around approximately ten minutes every hour, then he could not perform any of the jobs the ALJ ultimately found plaintiff could perform. In light of this testimony, the ALJ "failed to meet his responsibility to help develop the evidence." *Cook*, 783 F.2d at 1173.

The second ground for reversal is that there is not substantial evidence in the record to support a finding of "borderline intelligence," as no standardized intelligence test was administered to plaintiff. If plaintiff has a full-scale IQ of between 60–69, he could be found disabled in light of his other impairments. 20 C.F.R. § 404, Subpart p, App. 1, 12.05 C.[7] *See also Townsend v. Heckler*, 581 F.Supp. 157 (W.D.Va.1983) (remanding Secretary's finding of non-disability where plaintiff suffered from significant impairment and had established IQ test scores of below 70). Here, plaintiff was treated as an outpatient at the Wilson Mental Health Clinic, but was not administered a standardized intelligence test. The ALJ was "kind of surprised" that no WAIS test was performed, and plaintiff's representative explained that the Wilson clinic was different from most other mental health clinics as it does not perform a standardized IQ test on intake. (R. 120). Yet such a test is necessary here.

The SSA regulations recognize that the results of well-standardized psychological tests such as the WAIS are useful in establishing the existence of a mental disorder.

Indeed, the scores set forth in 20 C.F.R. § 404, Subpart P, App. 1, 12.05 C are based upon the WAIS test.[8] "In cases involving impaired intellectual functioning, a standardized intelligence test, *i.e.*, the WAIS, should be administered and interpreted by a psychologist or psychiatrist qualified by training and experience to perform such an evaluation." 20 C.F.R. § 404, Subpart P, App. 1, 12.00. The regulations further provide that in cases where the nature of the individual's intellectual impairment is such that standardized intelligence tests are *precluded*, then medical reports *specifically* describing the level of intellectual function should be obtained. *Id.* Here, there is no evidence or reason to believe that plaintiff's impairments preclude standardized intelligence testing. In light of the Secretary's regulations, such a test should have been administered to plaintiff.[9]

Here again, however, the Secretary seeks to avoid this result by shifting the burden to plaintiff. The Secretary asserts that plaintiff had an opportunity to provide evidence of mental retardation, but failed to do so. *See Willis v. Secretary of Health and Human Services*, 727 F.2d 551 (6th Cir.1984) (holding that 42 U.S.C. § 405(g) limits the district court's discretion to remand for reconsideration in light of new evidence). The Secretary points out that at the close of the December 9 hearing, the ALJ held the record open to permit plaintiff to submit the results of psychological testing that might have been administered by Vocational Rehabilitation. (R. 120).[10] A close review of the record, however, indicates that plaintiff was not negligent in failing to submit an IQ test. Plaintiff's representative informed the ALJ that on several occasions she requested the

---

7. *See supra* note 3.

8. In cases where more than one IQ is customarily derived from the test administered, *i.e.*, where verbal, performance, and full-scale IQs are provided as on the WAIS, the *lowest* of these scores is used in conjunction with listing 12.05. 20 C.F.R. § 404, Subpart p, App. 1, 12.00.

9. At the hearing, the vocational expert testified that it is "fairly routine" for VR to perform psychological testing on a person with an employment background such as plaintiff. (R.

121). However, there is no evidence in the record to indicate that such testing was performed.

10. At the hearing, the vocational expert opined that the Wilson clinic did not administer any intelligence tests because "they figured it'd probably already been done [by Vocational Rehabilitation] and it wasn't necessary for them to do it." (R. 121). The ALJ therefore held the record open to obtain the VR report.

records from VR but never received them and therefore did not know whether any intelligence testing was performed or whether VR simply failed to comply with her request. (R. 122). The following colloquy then took place between the ALJ and plaintiff's representative:

ALJ: [I]f we were to request the records for Mr. Ballard would we have to give the dates of the visit?

ATTY: No, you would ...

ALJ: We could just say Mr. Willie F. Ballard, right?

ATTY: File—the file of Mr. Willie J. Ballard and they would give their no—under normal circumstances they would just send the—a copy of the entire file or mail it.

ALJ: We'll do that for you. Ms. Bridges, would you please note our files that after the hearing that we would make sure that Mr. Ballard has signed the correct release forms so that we can get his records and we'll do that. Social Security will—hold the record open and we will get those records from VR.

(R. 123). The ALJ then told Mr. Ballard that he, the ALJ, "will try to get those records from Vocational Rehabilitation" and would make those the next numbered exhibit in the file. (R. 123). Clearly, the

ALJ was under the impression that VR performed an intelligence test and the ALJ undertook to obtain the VR files on behalf of plaintiff. It was reasonable for plaintiff to assume that the ALJ would use the results of any psychological testing by VR in determining whether to grant or deny benefits.[11]

Importantly, the ALJ made no finding that the *lack* of intelligence testing by VR was immaterial to his determination. Indeed, the ALJ evidently considered plaintiff's intelligence to be a material factor in the disability determination for he left the record open for such evidence. A search of the VR records submitted in response to the ALJ's request fails to uncover the results of any standardized IQ test or other psychological tests purportedly administered plaintiff.[12] Therefore the ALJ lacked a sufficient documentary basis for determining that plaintiff has "borderline intelligence" and is not mildly retarded.[13] Accordingly, The Court remands this matter to the Secretary with instructions to take whatever steps are appropriate to ensure that a standardized intelligence test is administered to plaintiff and thereafter to consider anew whether plaintiff is disabled.[14]

**11.** As the ALJ stated to plaintiff near the close of the hearing, "When I do get those [VR records] I will sit down and I'll look at all the documents in evidence again and I'll, of course, consider the testimony ... here today with those documents in evidence." (R. 123). Given the ALJ's representation, it was reasonable for plaintiff to assume that the results of any psychological testing by VR would be carefully considered by the ALJ.

**12.** Attached to the ALJ's decision is an OHA Psychiatric Review Technique Form [hereinafter the Form] which indicates that plaintiff exhibits factors of mental retardation. (R. 16). The Form also indicates that plaintiff does not have a valid verbal, performance, or full scale IQ of below 70. (R. 17). Yet the record contains no evidence that plaintiff was administered an IQ test.

**13.** *See* R. 118–19. In discussing a mistake in the record on whether plaintiff was given an axis two diagnosis, the vocational expert testified that a borderline intellectual functioning is an axis two diagnosis, so therefore "if in fact a borderline intellectual functioning, *and that's not documented,* exists, that is an axis two diag-

nosis." (R. 118–19). Accordingly, at the time of the December 9 hearing, there was no documented evidence that plaintiff had a borderline intelligence level, and the VR records submitted after the hearing do not reveal that plaintiff was administered a standard intelligence test.

**14.** In her report, the Magistrate also recommended that this case be remanded on the ground that plaintiff requires psychological testing to determine whether he suffers from a severe adjustment disorder. A review of the record indicates that plaintiff was given some testing regarding his alleged adjustment disorder, and the vocational expert opined that even if plaintiff suffered from an adjustment disorder he could perform certain light sedentary jobs. (R. 106–07; 312–20). The Court, therefore, does not require the Secretary to perform further testing with respect to plaintiff's adjustment disorder. But the Secretary should consider anew all evidence of plaintiff's adjustment disorder together with the results of plaintiff's intelligence test and vocational examination.

CONCLUSION

For the reasons stated above, the Court reverses the Secretary's determination and remands this case to the Secretary for further proceedings. Specifically, the Court orders (i) that plaintiff be administered a standardized intelligence test of the type suggested in 20 C.F.R. § 404, Subpart P, App. 1, 12.00, and (ii) that plaintiff receive a vocational examination which carefully considers plaintiff's asserted need to move around periodically in order to relieve pain. The Secretary should then consider the results of these tests along with the evidence of plaintiff's adjustment disorder in determining whether plaintiff is entitled to disability benefits, as the synergistic effect of all these factors is essential to the Secretary's determination.[15]

---

**15.** Plaintiff may indeed have been able to perform unskilled work although mildly retarded. However, if plaintiff is mentally retarded, this disability, coupled with plaintiff's physical disability and possible severe adjustment disorder, could well prevent plaintiff from engaging in any employment. 20 C.F.R. § 404, Subpart P, App. 1, 12.05 C. Therefore the Secretary must consider the synergistic effect of *all* plaintiff's disabilities.