4 F.3d 984
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Dorothy B. BENTHALL, Plaintiff-Appellant,
v.
Donna SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 92-2419.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 4, 1993.
Decided: August 30, 1993.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Walter E. Hoffman, Senior District Judge. (CA-91-130-NN)
 Lee Edward Wilder, Rutter & Montagna, Norfolk, Virginia, for Appellant.
 Steven Michael Rollins, Department of Health & Human Services, Philadelphia, Pennsylvania, for Appellee.
 Charlotte Hardnett, Chief Counsel, Region III, Candace Jenkins McNeir, Assistant Regional Counsel, Office of the General Counsel, Department of Health & Human Services, Philadelphia, Pennsylvania; Richard Cullen, United States Attorney, Michael A. Rhine, Assistant United States Attorney, Norfolk, Virginia, for Appellee.
 E.D.Va.
 REMANDED.
 Before WIDENER and LUTTIG, Circuit Judges, and HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 HEANEY, Senior Circuit Judge:
 
 OPINION
 
 1
 Dorothy B. Benthall appeals from an order of the district court granting the Secretary's motion for summary judgment on her claim for disability insurance benefits. Because we conclude that the administrative law judge (ALJ) failed to fully develop the record[1] and asked a hypothetical question that failed to set forth all of Benthall's impairments, we vacate the judgment of the district court and remand the case with instructions to return it to the Secretary for proceedings consistent with this opinion.
 
 
 2
 Benthall was born in August 1932, has a ninth grade education, and formerly worked as a housekeeper/baby sitter, factory laborer, packer, nurse's aid, and ice-cream store clerk. She filed her current application for disability benefits on March 27, 1989, alleging that she had been disabled since November 27, 1979, because of the following ailments: heart disease, high blood pressure, angina, arthritis, eye disease, bladder problems, bronchitis, asthma, memory loss, physical and emotional stress, migraine headaches, and poor circulation. She was last insured for disability benefits on March 31, 1985. Her work history reveals that she did not engage in any substantial gainful activity during the relevant period of time (November 27, 1979, through March 31, 1985), and the ALJ concedes this to be the case.
 
 
 3
 Benthall's claim was denied initially and upon reconsideration. She then requested a hearing before an ALJ. A hearing was held on June 15, 1990, at which the ALJ considered the application for disability benefits. The ALJ found that Benthall retained the ability to return to her past work as a housekeeper/baby sitter at all times through March 31, 1985. The ALJ's decision was upheld by the Appeals Council, thereby becoming the final decision of the Secretary. Benthall then filed the instant action for judicial review. The case was referred to a magistrate who concluded that there was substantial evidence to support the Secretary's denial of benefits. The district court agreed and granted the Secretary's motion for summary judgment.
 
 
 4
 A careful review of the record convinces us that the ALJ made many errors that require us to remand the case for further proceedings. First, the ALJ did not focus the disability hearing on the critical issue of whether Benthall was disabled on or before March 31, 1985. During the hearing, the ALJ failed to question Benthall in detail as to her condition during the time period at issue[2] even though the evidence submitted shows that she was treated and prescribed medications for a variety of ailments.[3]
 
 
 5
 Second, at the hearing, the vocational expert testified that Benthall's job as a housekeeper/baby sitter would be classified as a job with a medium exertional level, which is defined in the Social Security Regulations as involving lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. Notwithstanding this classification of Benthall's past work, the ALJ posed the following hypothetical question to the vocational expert:
 
 
 6
 Q. If I were to find that as of March, 1985, when it appears that her insured status expired, that she were capable of no more than sedentary work, would there have been a significant number of jobs that would have existed at the sedentary, unskilled level that she could have performed?
 
 
 7
 (R. at 57 (emphasis added).) On the basis of this hypothetical, the vocational expert testified that there would be work in the national economy that Benthall could perform. The expert gave as examples the sedentary jobs of self-service cashier and dial marker and indicated that there were a significant number of these jobs available nationally. The expert testified further, however, that pain to a degree significantly affecting Benthall's concentration and requiring her to rest and change positions frequently would affect her ability to perform as a self-service cashier and dial marker.
 
 
 8
 One can only assume from the hypothetical that the ALJ, at least at the time of the hearing, considered Benthall to be limited to performing sedentary work. Had the ALJ gone on to make this finding in his decision, then Benthall would have qualified as disabled under 20 C.F.R. Part 404, Subpart P, App. 2, Table No. 1, Rule 201.01, which states that a person closely approaching advanced age (50-54) (as was Benthall), with a limited education (which Benthall has), with prior unskilled work experience (which Benthall has), is automatically entitled to a disability classification. Instead, the ALJ, relying solely on section 15C of Exhibit 9,[4] found that Benthall was able to return to her past work as a housekeeper/baby sitter. An examination of the entire exhibit, however, reveals that Benthall's job as a housekeeper/baby sitter required her to do heavy housework, including cleaning, washing, mopping, vacuuming, changing beds, and dressing children. The latter duty alone certainly requires lifting more than ten pounds. Benthall testified at the hearing that she could no longer baby sit because she could not lift the children or do the work. (R. at 43.) The ALJ gives no explanation as to why he ignored the testimony of the vocational expert as to the exertional level of Benthall's work, and makes no effort to reconcile the testimony of the vocational expert and Exhibit 9.
 
 
 9
 Third, the ALJ found that Benthall was severely impaired prior to March 31, 1985, because of her hypertension and bronchitis, which reduced her ability to engage in arduous physical exertion. "Arduous" is a term that is not used in the Social Security regulations; we therefore have no way of knowing what the ALJ meant by that term. In the regulations, "work" is defined as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. Sec. 404.1567 (1992). On the basis of the Secretary's expert's testimony, we can only assume that the ALJ was accepting the vocational expert's classification of Benthall's work as medium. This being the case, there is nothing in the record to support the ALJ's finding that Benthall is able to perform such work.
 
 
 10
 Fourth, the ALJ found that although Benthall's hypertension and bronchitis reduced her ability to engage in arduous physical exertion, this combination of illnesses was not sufficient to keep her from returning to her past work. No medical testimony in this record supports that finding. Moreover, the ALJ failed to take into consideration the nonexertional nature of these impairments. Thus, his finding that they did not meet or equal the Listing of Impairments is not supported in the present record. Fifth, the ALJ acknowledged that the claimant had nerve problems as of May 1980. He then concluded that because no subsequent progress reports through March 31, 1985, made mention of other problems or functional limitations secondary to Benthall's nerves, her nerves did not constitute a severe impairment at any time prior to March 31, 1985. In making this finding, the ALJ apparently ignored the fact that during this entire period Benthall was being prescribed medications for her nervous condition. (R. at 119120.)
 
 
 11
 Lastly, the ALJ noted that Benthall did develop atherosclerotic coronary artery disease, peripheral vascular disease (for which she underwent bilateral femoral bypass grafting in April 1986), and mild coronary artery disease, but only after her insured status expired. Benthall was in fact admitted to the hospital for over a week approximately one year after her insured status expired. She was then diagnosed with arteriosclerotic occlusive disease of the right common iliac artery with peripheral vascular insufficiency, hypertension, and coronary heart disease with angina. On the discharge summary, her physician noted that she "had been suffering from disabling claudication particularly the right leg for the previous six month[s]...." (R. at 123.) Even one unskilled in medicine would most likely conclude that Benthall's ailments did not develop overnight. An appropriate line of questioning would have developed the extent to which this condition had developed prior to March 1985.
 
 
 12
 Under the above circumstances, it perhaps would be appropriate to remand to the Secretary with directions to award Benthall benefits. We believe, however, the better course is to remand for a further hearing before the ALJ: first, to take further medical evidence with respect to Benthall's disabilities prior to March of 1985, and second, to determine whether in light of these disabilities, some of which are exertional and other nonexertional, Benthall is able to perform sedentary, light, or medium work as those terms are defined in the regulations. In making this determination, because some of her disabilities are clearly nonexertional, the testimony of a vocational expert must be secured; questions posed to the expert must be consistent with the rule in this circuit.[5]
 
 
 13
 Accordingly, the judgment of the district court is vacated, and the case is remanded to the court with directions to remand to the Secretary for further proceedings consistent with this opinion. The Secretary is further directed to allow the parties an opportunity to present any additional evidence with respect to Benthall's disability during the period from November 27, 1979 to March 31, 1985.
 
 REMANDED
 LUTTIG, Circuit Judge, dissenting:
 
 14
 As the Virginia Bureau of Disability Determination, the ALJ, the Appeals Council, the magistrate-judge, and the district court before us found, it is abundantly clear from even a cursory review of the record that Benthall failed to establish that she was disabled from returning to work between November 1979 and March 1985. Not only did she utterly fail to produce any medical evidence that her bronchitis and hypertension afflictions prevented her from returning to her work as a babysitter/housekeeper during the relevant time period; the only medical evidence that she did introduce tended to confirm that she was not disabled.
 
 
 15
 Dr. O.W. Ward, Benthall's treating physician from 1979 to 1985, wrote in 1989-four years after the period in question-that Benthall's arteriosclerosis "has gradually been getting worse for many years and is now disabling her from working," Tr. at 121 (emphasis added). He notably did not opine that she had been disabled during the period for which she was insured. And, in fact, during his numerous examinations of Benthall between 1979 and 1985, he never suggested that she limit her activities at all. Nor did he ever treat her for chronic pain or prescribe for her strong pain medicine. Tr. at 24. The only other evidence offered by Benthall in support of her claimed disability was an opinion from Dr. Lambert P. McLaurin. He stated only that Benthall was disabled at the time he examined her in 1990; he did not purport to testify as to her condition previously. Tr. at 158. Thus, significantly, and to their professional credit, neither physician was willing to render an opinion that Benthall was disabled prior to March 1985. Given Benthall's failure to produce any medical evidence that she was disabled from working between 1979 and 1985, the ALJ was fully justified in denying her benefits.
 
 
 16
 The majority all but concedes that Benthall failed to satisfy her burden of proving disability. Rather than simply acknowledge that Benthall failed to meet her burden and that the ALJ therefore was obligated to deny her benefits, however, the majority strains to identify a series of "errors" committed by the ALJ-none of which were raised by appellant-the combination of which, it holds, warrants reversal. None of these "errors" is such and, even if they were, certainly none is (nor are any in combination) reversible error.
 
 
 17
 First, the majority claims that "the ALJ failed to question Benthall in detail as to her condition during the time period at issue." Ante at 2-3 (footnote omitted). Not only did the ALJ specifically inquire as to Benthall's condition prior to March 1985, but Benthall provided such a thorough response that any further questioning would have been unnecessary and redundant. Tr. at 52.
 
 
 18
 Second, the majority faults the ALJ for relying on Benthall's own characterization of her prior work's exertional requirements, rather than a vocational expert's opinion, in determining whether she could return to work. Ante at 4-5. This criticism exposes a basic misunderstanding of the role of vocational experts. Their expertise concerns the availability of work in the national economy, not the nature of a claimant's prior work.* See 20 C.F.R. Sec. 404.1566(e). In fact, the testimony of the vocational expert, who had no particular familiarity with the nature of Benthall's prior work, had no bearing whatsoever on the question of whether Benthall could return to her prior work. Thus, the ALJ had no choice but to rely on Benthall's own description of her prior work in this regard.
 
 
 19
 Third, the majority makes much of the fact that the ALJ stated that Benthall's conditions reduced her ability to do"arduous" work, and thus were severe. From this statement, the majority"assumes" that the ALJ classified Benthall's prior work as requiring"medium" exertion. Ante at 4-6. "That being the case," the majority proceeds, "there is nothing in the record to support the ALJ's finding that Benthall is able to perform such work." Id. at 5-6. This is a sleight-of-hand. Not only did the ALJ never find Benthall's work to require"medium" exertion, it made a specific finding as to what her work did require, based on Benthall's own description of that work. Tr. at 23.
 
 
 20
 Fifth, the majority complains that "the ALJ apparently ignored the fact that during this entire period Benthall was being prescribed medications for her nervous condition." Ante at 6 (citation omitted). That Benthall received medication during the relevant period of course cannot support a finding of "disability," particularly where, as here, the treating physician never even hinted that she should curtail any activity, at work or elsewhere. The most reasonable inference is the one the ALJ drew-that the prescribed medication controlled her condition and prevented any disability. Tr. at 23.
 
 
 21
 Finally, the majority points to the fact that Benthall was admitted to the hospital over one year after she was no longer insured. Obviously, that Benthall was hospitalized a year after her insurance expired cannot support a finding of "disability" in the absence of evidence that the disability prompting hospitalization was of longstanding. Forced to concede this, the majority faults the ALJ for not further questioning Benthall as to the extent that her condition had developed prior to March 1985. In fact, as noted, the ALJ did question Benthall as to her condition prior to 1985. Furthermore, the ALJ had ample evidence of Benthall's condition prior to 1985-the exhaustive records of her treating physician at the time-all of which indicated that she was not then disabled.
 
 
 22
 Benthall may very well be disabled today, and she may not have been in perfect health during the period in question. It cannot be disputed, however, that she produced no evidence whatsoever that she was disabled during the relevant period. As a consequence, the Secretary properly denied her benefits, and I would summarily affirm that decision.
 
 
 
 [1]
 See Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980) ("Where the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded."
 
 
 [2]
 The only question posed to Benthall regarding her medical condition during the time period between November 27, 1979, and March 31, 1985, is as follows: "Q: Prior to March of 1985, what, what was your condition like then?" (R. at 52.) There was also no follow-up to Benthall's answer to this question
 
 
 [3]
 During the period from November 1979 to March 1985, the record shows that Benthall was treated for the following impairments: bronchitis, myositis of the right side of spine, nerve problems, dizziness, nausea, undetermined central nervous system disease, questionable glaucoma, chip fracture of left tibia, heart pain, racing/pounding heart, shortness of breath, tiredness, upper respiratory infection, and cervical adenopathy. The record also shows that she was prescribed the following medications: Diclomycin (reduces spasms of the bladder, urethra, and digestive system); valium (for nerves); Digoxin (strengthens heart muscle, correctsirregular heartbeat); Ativan (for nervousness and tension); Indural (for angina attacks, irregular heartbeat, lowers blood pressure, reduces frequency of migraine headaches); Procardia (for angina attacks); ampicillin (for upper respiratory infection); and nitroglycerine (reduces frequency and severity of angina attacks). This evidence clearly establishes that Benthall was repeatedly prescribed medications for heart and chestrelated problems. Under the Social Security Regulations, chest pain of cardic origin is found in the Listing of Impairments. It is not clear why the ALJ made no mention of Benthall's angina in his decision. See 20 C.F.R. Part 404, Subpart P, App. 1 Sec. 4.00 paragraph (E) (Sec. 4.00 "Cardiovascular System" was effective through June 5, 1992). On remand this should be explored
 
 
 [4]
 In section 15C of the form which comprises Exhibit 9, Benthall notes that ten pounds is the heaviest weight lifted and most frequently carried. In the preceding section (15B), however, she describes four of her previous jobs. Thus, it is not clear as to which job section 15C refers. Even assuming that section 15C is referring to her job as a housekeeper/baby sitter, it is still inconsistent with Benthall's statement in section 15B that as a housekeeper/baby sitter she did heavy housework and dressed children
 
 
 [5]
 In this circuit, it is well-settled that
 [t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.
 Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (citations omitted). In the present case, the hypotheticals asked to the expert witness were similar to the hypotheticals found to be improper in Walker. In Walker, the following questions were posed by the ALJ to the vocational expert:
 Q. If Mr. Walker was limited to [per]forming sedentary work, would he be able to transfer any of the prior skills to any sedentary jobs?
 * * * *
 Q. Mr. Walker has told us about a number of health problems that cause him functional limitations and subjective distress, too. If I found all of his testimony to be credible and supported by the medical evidence, how would that affect his ability to do the types of jobs you've discussed with me.
 Id.
 
 
 *
 In fact, throughout its opinion the majority confuses the inquiry of whether work exists in the national economy with the question whether Benthall could return to her prior work. For example, the majority states that, had the ALJ made a finding that Benthall was limited to "sedentary" work, she would have qualified as disabled. Ante at 4. This is only true if she could not have returned to prior work, which, the ALJ found, was not the case. Later, when characterizing Benthall's prior work, the majority faults the ALJ for not categorizing Benthall's prior work as "sedentary, light, medium, heavy [or] very heavy." Ante at 5 (citing 20 C.F.R. Sec. 404.1567). These categories, however, which are indeed relevant in classifying available work in the national economy, are irrelevant here, where the only question is whether the claimant can or cannot perform the particular work that she previously performed