Dwayne A. FLEMING, Plaintiff

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. CIV.L–02–1825.

United States District Court,
D. Maryland.

Sept. 5, 2003.

Dwayne A. Fleming, pro se, Montgomery Village, MD, for Plaintiff.

Kristine L. Sendek Smith, Neil R. White, Office of the United States Attor-

ney, Thomas M. DiBiagio, Baltimore, MD, for Defendant.

### ORDER

LEGG, Chief Judge.

Upon consideration of the Report and Recommendation of United States Magistrate Judge Susan K. Gauvey, entered August 15, 2003, and no objections having been filed, it is this 5th day of September, 2003, by the United States District Court for the District of Maryland,

ORDERED:

1. That the Report and Recommendation is hereby AFFIRMED and ADOPTED;

2. That the defendant's motion for summary judgment is DENIED;

3. That this case be REMANDED back to the agency for further proceedings;

4. That the Clerk of Court shall mail copies of this Order to plaintiff and to counsel for the defendant; and

5. That the Clerk of Court is directed to CLOSE this case on this Court's docket.

### *Report and Recommendation*

Plaintiff, Dwayne A. Fleming, filed this action seeking judicial review, pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), who denied his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("the Act").

Currently pending before the Court is the Commissioner's motion for summary

judgment. (Paper No. 13). Plaintiff is pro se and has not filed a cross motion or a response to defendant's motion.[1] No hearing is necessary in this case. Local Rule 105.6. For the reasons set forth below, the undersigned recommends that the defendant's motion for summary judgment be denied and the case remanded, as the Commissioner's denial of benefits was reached by application of incorrect legal standards.

### I. *Procedural History*

Plaintiff filed an application for DIB and SSI on October 17, 2000. (R. 73–75). Plaintiff alleged disability since June 21, 2000, because of a right tibial plateau fracture. (R. 79). Plaintiff's claim was denied, both initially and upon reconsideration. (R. 45–46, 47–49, 54–55, 146–49). Thereafter, plaintiff requested and received an administrative hearing, which was held on October 12, 2001. (R. 17–44). On February 28, 2002, the Administrative Law Judge ("ALJ") issued a written decision denying plaintiff's claim. (R. 7–16). The Appeals Council denied review on May 1, 2002. (R. 4–5). This makes the ALJ's decision a final decision of the Commissioner, and the instant case ripe for review.

### II. *Factual Background*

Plaintiff was born on January 7, 1960, and thus at the time of the ALJ's decision was 42 years old. (R. 22). He is separated from his wife and has three children under the age of eighteen. (R. 22). He lives with his children as well as with his aunt and her husband. (R. 22, 24). He earned a general equivalency degree in 1981 and served in the U.S. Army from 1977 until 1985.[2] (R. 25, 85, 93). He

---

1. The scheduling order directed plaintiff to file any motion for summary judgment by April 1, 2003 and any response to defendant's motion by May 31, 2003. (Paper No. 11).

2. The record indicates that his military occupational specialty was motor vehicle operator. (R. 93).

subsequently earned a certificate in air conditioning and refrigeration technology in 1986 and was employed in the civilian work force as a maintenance engineer, fast-food restaurant manager and delivery driver from 1986 until June 20, 2000. (R. 26, 80, 92–93).

## A. Medical Evidence

On June 20, 2000, plaintiff was involved in a car accident in which he fractured his right leg. (R. 118).

### 1. Plaintiff's Doctors

Following the accident, Plaintiff was admitted and treated at Montgomery General Hospital. (R. 82, 113–124). He sustained a right tibial plateau fracture as his only injury. (R. 118). Upon examination, it was determined that plaintiff was otherwise in good health with no chronic medical conditions. (Id.). However, it was also noted that he was obese, as he weighed 325 pounds and was 5 feet, 7 inches tall. (Id.). Imaging revealed that plaintiff's fracture comprised an "[e]xtensive comminuted [3] fracture of the posterior and lateral tibial plateau with displaced ... fracture fragments posteriorly." (R. 120).

Plaintiff was subsequently transferred to Suburban Hospital on June 22, 2000 where he apparently underwent surgical repair to his right leg.[4] (R. 83, 116, 119). On July 21, 2000, plaintiff apparently was discharged from Suburban Hospital and was admitted either at Medi–Plex or Sunbridge Montgomery Village Care and Rehabilitation for custodial care, as he could not yet move his leg.[5] (R. 83, 133). The record indicates that he was still in this nursing facility[6] as of November 29, 2000[7] (R. 131), but was released on December 7, 2000.[8] (R. 95, 130). Thus, plaintiff was either hospitalized or an in-patient at a nursing or rehabilitative facility for over five months after his accident, although there are no surgical, in-patient, or nursing or rehabilitative facility records before the Court.

On August 25, 2000, two months after his accident, plaintiff's treating physician, James M. Weiss, M.D.,[9] examined him. (R. 133). Dr. Weiss noted that he was

---

**3.** Use of the term "comminuted" indicates that the tibial plateau was broken into several pieces. See Stedman's Medical Dictionary, 371 (26th ed.1995).

**4.** The actual operative notes from plaintiff's surgery and the records of his treatment and month-long stay at Suburban Hospital for his leg fracture are not in the record. The only record from Suburban is a surgical pathology report for a gastric biopsy, noting chronic active gastritis. (R. 125–126). However, the follow-up reports of Dr. Weiss, plaintiff's orthopaedist, are in the record. (R. 128–133). Dr. Weiss, according to plaintiff's disability report, performed the surgery. (R. 81).

**5.** Dr. Weiss, in a follow-up report dated August 25, 2000, stated: "[Patient] [i]s at Medi–Plex ... [and is] basically undergoing custodial care there as he is not a candidate for therapy until he can move his leg." (R. 133). In his initial disability report, plaintiff stated that he was discharged from Suburban Hospital on July 21, 2000, and was admitted that same day as an in-patient to Sunbridge Montgomery Village Care and Rehabilitation. (R. 83).

**6.** There are no records before the Court from this facility.

**7.** Dr. Weiss's follow-up report dated November 29, 2000, stated: "He is now five months out, [and] is at the nursing home ...." (R. 131).

**8.** One of Dr. Weiss's follow-up reports, dated December 20, 2000, stated: "[He] is living with a friend, apparently, now as he was discharged from the subacute care." (R. 130).

**9.** Dr. Weiss's letterhead indicates that he specializes in orthopaedic surgery, sports medicine, and spine surgery, and is board certified. (R. 129–132).

taking Vicodin,[10] and that his leg was non-weight bearing. (*Id.*). Dr. Weiss found that his pin sites and knee incision were benign and that he was neurovascularly intact. (*Id.*). His x-rays revealed "excellent position of his fracture and reduction." (*Id.*). Dr. Weiss planned to remove plaintiff's fixator the following week and "start him on active assist . . . and passive range of motion to his right knee." (*Id.*). Dr. Weiss noted plaintiff would continue to be non-weight bearing for another month after that. (*Id.*).

On September 22, 2000, Dr. Weiss again examined plaintiff. (R. 132). Dr. Weiss noted that plaintiff was in a wheelchair and that his leg lacked "a few degrees of full extension" and "quite a bit of flexion." (*Id.*). His x-rays revealed that the fractures were healing well with intact hardware. (*Id.*). He stated that plaintiff "is beginning to get motion now out of the fixator [and] [i]s getting therapy for this." (*Id.*). Dr. Weiss noted that plaintiff could "begin weight-bearing as tolerated[,]" and suggested starting with pool therapy, followed by weight-bearing on dry land and a stationary bicycle. (*Id.*). Dr. Weiss planned to see plaintiff again in a month.[11]

On November 29, 2000, Dr. Weiss re-examined plaintiff. (R. 131). He noted that plaintiff was still at the nursing home, was doing aquatic therapy, and was "weight bearing as tolerated", although he arrived in a wheel chair. (*Id.*). The x-rays revealed "essentially anatomic fixation." (*Id.*). Plaintiff had active quad extension, but lacked "about five to ten degrees of full extension." (*Id.*). Plaintiff had flexion to almost 90 degrees. (*Id.*). Dr. Weiss indicated that he planned to put plaintiff on crutches and that he "will con-tinue water therapy and start PT." (*Id.*). He also noted that he had given plaintiff a handicapped sticker, and that when he could walk independently he could begin to drive. (*Id.*).

On December 20, 2000, Dr. Weiss again examined plaintiff, noting that he had been discharged from subacute care since his last exam. (R. 130). Dr. Weiss noted that plaintiff was using a walker, had been ambulating independently, was doing aquatic therapy, and was using Vicodin on an occasional basis. (*Id.*). Plaintiff had approximately 30–40 degrees of total motion in his right knee, and had some bilateral lower extremity swelling. (*Id.*). The X-rays revealed excellent position of his fixation, no loss of the reduction, and no evidence of any arthritis. (*Id.*). Dr. Weiss transitioned plaintiff to a cane, but noted that he might still require intermittent use of the walker. (*Id.*). Dr. Weiss also stated that "it would be nice if he could get some physical therapy for range of motion of the knee . . . ." (*Id.*).

On February 5, 2001, Dr. Weiss re-examined plaintiff. (R. 129). Dr. Weiss noted that plaintiff was not on any pain medication at that time and was ambulating with a left cane. (*Id.*). However, he had some stiffness in his knee and occasional clicking or popping. (*Id.*). Dr. Weiss found that plaintiff had "about full extension" and flexion "to about 80 degrees." (*Id.*). However, he also stated that the exam was complicated by plaintiff's size. (*Id.*). The X-rays showed good position of his fracture and screw placement. (*Id.*). Dr. Weiss noted that plaintiff now had medical assistance and thus wrote a prescription for therapy. (*Id.*). Finally, Dr. Weiss

---

10. Vicodin is a combination of hydrocodone bitartrate, an opioid analgesic similar to codeine, and acetaminophen, a non-opioid analgesic. Vicodin is prescribed to relieve moderate to moderately severe pain. *Physician's Desk Reference*, 516 (52d ed., 2002).

11. However, there is a two month gap in the record. (R. 131–132).

stated that he "would like [plaintiff] to progress to walking without a cane" and opined that he could "do a sedentary job at this point." (*Id.*).

On June 25 and July 2, 2001, based on an examination of plaintiff conducted on June 25, 2001, Dr. Weiss completed a Medical Evaluation Form and a Medical Report in which he indicated that plaintiff was unable to work and that the impairment was permanent. (R. 143, 145). Dr. Weiss noted that the causes of plaintiff's impairment were knee pain and internal derangement [12] as a result of his fracture as well as obesity. (R. 143, 144). Dr. Weiss indicated that plaintiff needed physical therapy. (R. 143, 144).

### 2. *Government Evaluations*

On November 14, 2000, a non-examining reviewer completed a medical summary record in which he noted that plaintiff's fractures were healing and concluded that the impairment "will not last 12 months." (R. 127). The reviewer had apparently considered the two examinations conducted by Dr. Weiss in August and September of 2000. (*Id.*).

On May 14, 2001, a second non-examining reviewer completed a physical residual functional capacity assessment. The examiner indicated, regarding exertional limitations, that plaintiff could: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 50 pounds or more; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and had an unlimited ability to push and/or pull. (R. 135). The examiner found no postural limitations. (R. 136). The examiner based his RFC assessment on his conclusion that plaintiff had no pain and was ambulating with a cane; that the x-rays showed good position of the frac-

ture; that plaintiff had full extension and 80 degree flexion; and that, based on Dr. Weiss's exam conducted February 5, 2001, plaintiff was going to "get PT and progress to walking [without] a cane." (R. 135). The examiner thus concluded that the impairment would not last twelve months. (*Id.*).

### B. *Testimonial Evidence*

### 1. *Disability Reports*

Plaintiff filed a Disability Report on October 13, 2000, in which he described his disabling condition as a right tibial plateau fracture which was surgically reduced and internally fixated. (R. 78–87). He indicated that his condition first manifested itself on June 20, 2000, the date of his accident. (R. 79). He stated that he was unable to walk on his right leg, noting that he was wheel-chair bound at the time. (R. 79).

Plaintiff listed his treatment and surgery at Montgomery General Hospital and Suburban Hospital, noting that he had been an inpatient at Suburban from June 21, 2000 until July 21, 2000. (R. 82–83). Plaintiff also indicated that he had been an inpatient at Montgomery Village Care and Rehabilitation since July 21, 2000 and that Montgomery Village had medical records and information about his condition. (R. 83).

Plaintiff noted that his medications included Ambien, for sleeping, with the side effect of headache; and Vicodin, for pain, with the side effects of dizziness, malaise, and weakness. (R. 84). Plaintiff filed a reconsideration disability report on January 17, 2001, in which he described poor mobility due to problems with standing and walking as well as severe right knee pain and fatigue. (R. 94–99).

Plaintiff completed a pain questionnaire on April 6, 2001, in which he stated that

---

12. Derangement is defined as "[a] disturbance of the regular order or arrangement." *Stedman's Medical Dictionary*, 461 (26th ed.1995).

walking and standing, among other activities, caused him pain in his right leg. (R. 100–104). He also noted that his medications included Ambien for sleeping and Vicodin for pain. (R. 101). Plaintiff stated that the pain sometimes caused him to lose his train of thought and made it difficult to sleep. (R. 102). He noted that he was not involved in rehabilitation, a work-hardening program, or treatment at a pain clinic. (R. 102).

Plaintiff also completed a Daily Activities Questionnaire on April 6, 2001. (R. 105–110). Plaintiff reported that he did some household chores with the assistance of his children, but that they took "a lot longer" to accomplish than before. (R. 106). He stated that he was able to walk, but needed frequent stops to rest his leg. (R. 106). He also explained that he needed help preparing meals, as he was unable to stand for long periods. (R. 106). Plaintiff further noted that he needed assistance to climb steps. (R. 108). Lastly, plaintiff reported that he was taking Vicodin. (R. 109).

### 2. ALJ Hearing

A hearing before an ALJ was held on October 12, 2001. (R. 17–44). Plaintiff and a vocational expert ("VE"), Mr. Robert Lester, testified at the hearing. (R. 17–19). Plaintiff was not represented at the hearing.[13] (R. 19). The ALJ noted for the record that he had advised plaintiff of his right to representation at the hearing. (R. 19). Plaintiff indicated, in response to the ALJ's question, that he wished to proceed without a representative. (R. 19).

The ALJ elicited biographical information from plaintiff already discussed. (R. 21–22). Plaintiff stated that he currently weighed 350 pounds. (R. 22). In response to the ALJ's questions about the physical layout of his home, plaintiff testified that while he lived in a three level house with his family, his bedroom and bathroom were in the basement which he accessed from the garage, requiring that he navigate one step. (R. 22–24). Plaintiff testified that he climbed the fourteen steps to the second floor twice a day to shower and use the kitchen and drove a car approximately once a week. (R. 23–24).

Plaintiff testified about his previous employment as a fast-food restaurant manager, maintenance engineer, and driver, all of which required extensive walking or standing and heavy lifting. (R. 26–29). Plaintiff stated that he was receiving public assistance and had a medical card. (R. 30). He described his accident and fracture, explaining that he had an external device on his leg for five months. (R. 31). Plaintiff testified that he had "very little" rehabilitation after the device was removed and that the cane he used was prescribed. (R. 31). He explained that he used a wheelchair at home, and had trouble using stairs. (R. 31). When he used the stairs, he had to put one foot on one step and then move the other foot to the same step. (R. 32). Plaintiff testified that he was in pain, and that he was taking up to 2400 milligrams of Ibuprofen per day, which provided some relief. (R. 32–33).

When asked how far he could walk using his cane, plaintiff responded "I would say a half a block without—", before he was cut off by the ALJ. (R. 34). Plaintiff testified that it had taken him half an hour to walk approximately one block from where he had parked for the hearing. (R. 34).

---

**13.** Although the hearing transcript states in its preamble that "[t]he claimant appeared in person and was represented by Jeffrey Gutman", the ALJ indicated in his opening statement that plaintiff was, in fact, not represented. (R. 19). Jeffrey Gutman, from the Baltimore Disability Entitlement Advocacy Program, withdrew representation on July 18, 2001. (R. 56–57).

Plaintiff also stated that he could only stand for ten minutes, at the most, had trouble balancing when standing, and that he had difficulty sitting comfortably. (R. 34–35).

Plaintiff testified that he did very little cooking or shopping and no dishes, although he did do laundry. (R. 36). He also reported difficulty dressing and bathing. (R. 37). Plaintiff stated that his understanding of his therapeutic exercise regimen was that he was to try to bend his leg every now and then and that he attempted to do so. (R. 37). He further explained that he rarely left his home for outside activities. (R. 36–37).

There was VE testimony. (R. 38–43). The VE defined heavy, medium, light and sedentary work as well as the differences between unskilled, semi-skilled, and skilled work. (R. 38–39). The VE found plaintiff's job as a delivery driver was not relevant, as he had only held it for a short time. (R. 39). The VE classified plaintiff's previous job as a maintenance engineer as heavy, skilled work and his position as a restaurant manager as heavy, semi-skilled work. (R. 39–40).

The ALJ then posed a hypothetical question to the VE. (R. 40–42). The ALJ asked the VE to consider a hypothetical individual with the following exertional limitations: the ability to lift ten pounds frequently and no more than twenty pounds occasionally; unable to do prolonged walking or standing; and limited push/pull capability involving one lower extremity. (R. 40–41). The VE responded that such an individual would be able to perform less than a full range of light work and less than a full range of sedentary work. (R. 41).

The ALJ then asked the VE to consider a person with the claimant's age, education, and work experience, and with exertional impairments which would permit light and sedentary work but less than a full range of each. (R. 41). Additionally, the ALJ added the following non-exertional limitations: no use of ladders, ropes or scaffolds; no kneeling; no crawling; and no "more than concentrated exposure to hazards such as moving machinery or unprotected heights." (R. 41–42).

The VE testified that such an individual could perform light, unskilled work as an assembler (76,000 nationally, 2000 locally) and as a cashier (138,000 nationally, 2000 locally). (R. 42). The VE further testified that such an individual could also perform sedentary, unskilled work as a final assembler (46,000 nationally, 600 locally) and as an order clerk in the food and beverage industry (137,000 nationally, 1,200 locally). (R. 42).

The ALJ then asked the VE, if plaintiff's testimony was given full credibility and was also supported by substantial medical evidence, whether there was any work he could perform. (R. 43). The VE replied that he "didn't hear anything with the testimony being consistent with the hypothetical." [14] (R. 43).

### III. *ALJ Findings*

In evaluating plaintiff's claim for disability, the ALJ followed the sequential five step process set forth in the Code of Federal Regulations. 20 C.F.R. §§ 404.1520, 416.920. Applying this sequence, the ALJ concluded that plaintiff was not under a disability [15] as defined in the Act. (R. 10, 14, 15).

---

**14.** Although this quotation is as stated in the transcription, presumably the VE meant "[in-]consistent."

**15.** The Act defines a disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

The first step of the process requires that the claimant show he has not been involved in substantial gainful activity for the period of alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). Here, the ALJ did not make any specific finding as to whether plaintiff had or had not engaged in substantial gainful activity since the alleged onset of disability.[16] (R. 10–16).

The second step requires the claimant demonstrate that his impairment is "severe," as defined in sections 404.1521 and 416.921.[17] 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that plaintiff had residuals of a right tibial plateau fracture and obesity, which he found to be severe impairments within the meaning of the regulations. (R. 11, 14).

The third step of the evaluation requires the claimant to establish that his severe impairments meet or equal the criteria of one of the impairments in the Listing of Impairments ("LOI") contained in 20 C.F.R. Part 404, subpart P, appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Here, the ALJ concluded that plaintiff's impairments did not meet or equal any of the listings, specifically Listing 1.11. (R. 11, 15). Where the claimant cannot establish that his severe impairments meet or equal the criteria of any impairment contained in the LOI, the analysis proceeds to the fourth step.

At the fourth step the claimant must show that because of his impairment he does not retain the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). In the current case, the ALJ found that plaintiff now had the RFC to lift 20 pounds occasionally; lift and carry 10 pounds frequently; to stand and walk, but not for a prolonged time; to occasionally climb stairs and ramps, balance, bend and crouch; but not to use ladders, ropes and scaffolds, kneel or crawl; and must avoid more than concentrated exposure to hazards. (R. 12–13, 15). The ALJ determined that plaintiff was unable to perform any of his past relevant work.

If the claimant's RFC prevents him from performing his past relevant work, the burden shifts to the Commissioner at the fifth step. *Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995). At this step, the Commissioner must show that, in light of the claimant's RFC, age and education, he can perform other work available in significant numbers in the local and national economies. 20 C.F.R. §§ 404.1520(f), 416.920(f). Such a determination should be made in light of the Medical–Vocational Guidelines ("grids") contained in 20 C.F.R. Part 404, subpart P, appendix 2.

In the present case, the ALJ found that plaintiff retained the RFC to engage in certain light work activities as defined in sections 404.1567(b) and 416.967(b). (R. 14, 15). However, as plaintiff cannot perform a full range of light work, strict application of the grids is not possible. (*Id.*). Therefore, a VE testified that although plaintiff is unable to perform the full range of light work, he is capable of making an adjustment to work that exists in significant numbers in the national and regional economies. (*Id.*).

Thus, after completing the five step evaluation process, the ALJ determined

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1).

**16.** However, plaintiff testified that he had not worked since the alleged onset of disability. (R. 26).

**17.** An impairment is severe within the meaning of the regulations if it imposes significant restrictions on the ability to perform basic work activities. 20 C.F.R. §§ 404.1521, 416.921.

that the claimant was not disabled. (R. 14, 15). Therefore, the ALJ found plaintiff ineligible for benefits under the Act. (*Id.*).

## IV. *Standard of Review*

The function of this Court is not to review Plaintiff's claim *de novo*, but rather to leave the findings of fact to the Commissioner. Under the Act, this Court must uphold the factual findings of the Commissioner if they are supported by substantial evidence and were reached through application of the correct legal standard. 42 U.S.C. §§ 405(g), 1383(c)(3) (2001); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.1996); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.1987), *rev'd on other grounds; Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1977). Substantial evidence "consists of more than a scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966). It is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ....' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

In reviewing for substantial evidence, this Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990). The Commissioner, and not the courts, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence before her will permit a conclusion inconsistent with his. *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir.1962). If the Commissioner's findings are supported by substantial evidence, the courts are bound to accept them. *Underwood v. Ribicoff*, 298 F.2d 850 (4th Cir.1962). However, despite this deference to the Commissioner's finding of fact, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman*, 829 F.2d at 517. If this has occurred, the Court is empowered by 42 U.S.C. § 405(g) to affirm, modify, or reverse the decision of the Commissioner with or without remanding the case for a rehearing. *Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

## V. *Analysis*

Plaintiff, who is pro se, makes no arguments on appeal, as he has not filed either a motion for summary judgment or a response to that of the Commissioner. Defendant asserts that substantial evidence exists in the record to support the conclusion that plaintiff was not disabled within the meaning of the Act. (Paper No. 13, at 10). Specifically, defendant argues first, that the ALJ appropriately considered the credibility of plaintiff's subjective allegations (*Id.* at 10–14); second, that the ALJ appropriately evaluated plaintiff's treating physician's final medical reports of June 25 and July 5, 2001 (*Id.* at 14–18); and finally, that the ALJ appropriately relied on the VE's testimony to support his determination that plaintiff was not disabled [18] (*Id.* at 18–21). Therefore, defendant argues that the ALJ's decision finding plaintiff not dis-

---

18. This argument is not addressed, as the undersigned finds that the ALJ applied the wrong listing at step three and failed to fulfill a heightened duty to develop the record resulting in unfair prejudice to plaintiff. Additionally, the ALJ also failed to consider a severe impairment at steps three and four of the analytical process. Such failure to discuss and consider an impairment infects the analysis at the remaining steps. *Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir.1986).

abled is supported by substantial evidence and should be affirmed.

The undersigned finds that improper legal standards were used, or proper standards were not adhered to, and the law was thus misapplied. First, the ALJ applied a superseded listing, and thus the wrong listing, to plaintiff's tibial fracture at step three. Second, the ALJ failed to properly consider plaintiff's extreme obesity in combination with the residuals of his tibial fracture at steps three and four. Third, the ALJ failed to fulfill the heightened duty to develop the record that is required in the case of a pro se claimant, which resulted in unfair prejudice to plaintiff. Therefore, for the reasons set forth below, the undersigned recommends that the case be remanded.

### A. The ALJ Applied the Wrong Listing to Plaintiff's Severe Tibial Fracture Impairment at Step 3.

 The ALJ purported to apply "Listing 1.11" in assessing plaintiff's severe tibial fracture impairment[19] at step three of the analytical process. (R. 11, ¶ 8). See also 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2001) (Listing of Impairments). The ALJ stated:

> [T]he claimant's fracture and obesity would be evaluated under Listing section 1.11 which requires that solid union not be evident on x-ray and return to full weight bearing not be expected within 12 months. In this case the x-

rays show that there is good fixation that is essentially anatomic as of November 29, 2000, within 5 months of the injury.

(R. 11, ¶ 8). However, Listing 1.11, which is the old listing applicable to, inter alia, tibial fractures, was ineffective and had been superseded at the time of the ALJ's decision, which was issued on February 28, 2002. Listing 1.11 had been superseded by Listing 1.06, the new re-designated listing for, inter alia, tibial fractures, which became effective on February 19, 2002. Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed.Reg. 58,010, 58,010–011, 58,019 (Nov. 19, 2001) (stating that "[t]hese regulations are effective February 19, 2002"). See also 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2002) (setting forth the redesignated listing for tibial fractures, Listing 1.06, in the Listing of Impairments). Furthermore, the agency, in explaining the effective date of the new regulations including, inter alia, Listing 1.06 for tibial fractures, stated that as of February 19, 2002, the new listing must be applied to all pending claims.

> As is our usual practice when we make changes to our regulations, we will apply these final rules to the claims of applicants for benefits that are pending at any stage of our administrative review process . . . .

---

19. The ALJ also purported to consider plaintiff's obesity in combination with his tibial fracture at step three, as required, as obesity was deleted as a specific listing impairment on August 24, 1999. See, e.g., Soc. Sec. Rul. 02–01p, 2000 WL 628049, *1 (S.S.A.2002). Notably, the Social Security Administration made changes to the listings to ensure that obesity is still addressed in the listings and evaluated in combination with other impairments, as discussed infra, section V.B. While the ALJ stated that "claimant has residuals of right tibial plateau fracture and obesity, im-

pairments that are severe . . . but not severe enough to meet or medically equal one of the [listed] impairments", the ALJ, as discussed infra, section V.B., provided no explanation of how he considered the combined effects of plaintiff's fracture and extreme obesity. Of course, the fact that the ALJ applied the wrong listing as to the fracture at step three exacerbates his failure to consider how plaintiff's obesity might have combined with the fracture to equal in severity the correct fracture listing, that is, Listing 1.06.

Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed.Reg. 58,010, 58,011 (Nov. 19, 2001). Thus, it is clear that the ALJ applied a listing that was no longer in effect, that is, Listing 1.11, to plaintiff's impairments, when he should have applied Listing 1.06. *See also Smith v. Apfel,* 154 F.Supp.2d 954, 957 (W.D.Texas 2001) (finding that the regulation in effect at the time of the ALJ's decision is the one that applies absent other express provision).

Although the first criterion of the two listings is substantially similar, the second criterion, which describes the level of musculoskeletal functional limitation required for a combination of impairments to establish listing-level severity, regardless of whether the first criterion is met, is materially changed. The criteria for 1.11, the superseded listing, were:

> 1.11 *Fracture of the femur, tibia, tarsal bone or pelvis* with *solid union not evident* on X-ray and not clinically solid, when such determination is feasible, and *return to full weight-bearing status did not occur* or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2001) (emphasis added). The criteria for 1.06, the effective listing, are:

> 1.06 *Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.* With:
>
> A. *Solid union not evident* on appropriate medically acceptable imaging and not clinically solid; and
>
> B. *Inability to ambulate effectively, as defined in 1.00B2b,* and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (2002) (emphasis added).

The second criterion of Listing 1.06 cannot be interpreted accurately in isolation by referring only to the listing itself. Significantly, the musculoskeletal listings were revised specifically in order to "*emphasize the impact of the impairment(s) on a person's ability to function,* and thereby to perform gainful activity, [by] clarify[ing] *the degree of musculoskeletal functional limitations required to establish listing-level severity ....*" Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed.Reg. 58,010, 58,012 (Nov. 19, 2001) (emphasis added). Accordingly, the agency also revised its regulations to define what it meant by "inability to ambulate effectively." *Id.* at 58,013. *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, at Section 1.00B2b (2002). Section 1.00B2b provides, in relevant part:

> (1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e. an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities ...
>
> (2) *To ambulate effectively,* individuals *must be capable of sustaining a reasonable walking pace* over a *sufficient distance* to be able to carry out activities of daily living ... *examples of ineffective ambulation include, but are not limited to,* the inability to walk without the use of a walker, two crutches or two canes, the *inability to walk a block at a reasonable pace* on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the *inability to climb a few steps at a reasonable*

*pace* with the use of a single hand rail. *The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.*

*Id.* (emphasis added). Notably, "if [a claimant] who uses [only] one cane or one crutch is otherwise unable to effectively ambulate, the impairment(s) might still meet or equal a listing." Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed.Reg. 58,010, 58,013 (Nov. 19, 2001).

In the instant case, as the ALJ applied the wrong listing, he by definition failed to evaluate either the medical or other evidence of record to determine whether plaintiff could or could not effectively ambulate at step three, as Listing 1.06 requires, for a combined impairments equivalence analysis. *See* Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed.Reg. 58,010, 58,012 (Nov. 19, 2001). Therefore, simply because the ALJ concluded that solid union was evident, under the first criterion of Listing 1.11, does not mean that plaintiff's impairments of the residuals of his fracture, when properly assessed under Listing 1.06 *in combination* with his extreme obesity, could not be *equivalent in severity* to Listing 1.06's ineffective ambulation standard. *Id. See also Hines v. Bowen,* 872 F.2d 56, 59 (4th Cir.1989) (explaining that "[a] failure to establish disability under the listings by reference to a single, separate impairment, does not always prevent a disability award"). Therefore, a claimant may be found disabled at step three, even without meeting each criterion of a particular listing, if he has a combination of impairments that is *equivalent in severity* to the functional limitations described in a listing. *Id. See also* Soc. Sec. Rul. 00–3p, 2000 WL 33952015, at *5 (S.S.A.2000) (specifying that "equivalence

[will be found at step three regarding a listed impairment] if an individual has multiple impairments, including obesity, no one of which *meets* or equals the requirements of a listing, but the combination of impairments is *equivalent in severity* to a listed impairment.").

The regulations specifically require the ALJ to consider the effects of obesity at step three when considering his tibial fracture under Listing 1.06. Section 1.00Q of the LOI provides that "when determining whether an individual with obesity has a listing-level impairment or combination of impairments . . . adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2002).

Even had the ALJ applied the correct listing to plaintiff's tibial fracture, there is no evidence, other than a bald statement to that effect, that he properly considered plaintiff's extreme obesity in combination with the residuals of his tibial fracture, as discussed *infra,* section V.B. Moreover, putting aside plaintiff's "subjective allegations" as to the severity of his impairments, all of the medical evidence of record from Dr. Weiss, the only examining source whose reports as discussed *infra,* section V.C., require further development in any case, indicates that plaintiff may not have been able to effectively ambulate under the second criterion set forth in Listing 1.06. Scanty though it is, the evidence indicates that when examined by Dr. Weiss in December of 2000 and February of 2001, plaintiff was still using a walker, at least intermittently, and a cane on a constant basis. There simply is no specific medical evidence as to whether plaintiff was, in fact, capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living, in accordance with effective ambulation under Listing 1.06 and Section

1.00B2b(2).[20] This is but one more reason why the record must be developed further under the heightened standard applicable to this case as discussed *infra*, section V.C.

**B. The ALJ Failed to Consider Plaintiff's Severe Impairment of Obesity in Determining that Plaintiff Did Not Meet or Equal Listing 1.11 at Step 3 and in Determining Plaintiff's RFC at Step 4.**

■ Generally, "[f]or a claimant to show that [his] impairment matches a Listing, [he] must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). In addition, a determination of whether a claimant's impairment meets or equals the LOI must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, with the corresponding criteria for the listed impairment. 20 C.F.R. § 416.926(a); *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir.1986) (remanding case because of, *inter alia*, the ALJ's failure to specifically compare each of the listed criteria of a relevant listing to

the evidence of the claimant's symptoms); *Ketcher v. Apfel*, 68 F.Supp.2d 629, 646–47 (D.Md.1999); *Giles v. Chater*, 1996 WL 116188, at *5 (W.D.N.Y.1996). However, as discussed *supra*, section V.A., Congress has provided that, "[i]n determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C.A. § 423(d)(2)(B). Furthermore, "[a] failure to establish disability under the listings by reference to a single, separate impairment, does not always prevent a disability award." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir.1989).

■ The ALJ focused on two factors in determining that plaintiff did not meet Listing 1.11. First, the listing, which was inapplicable to plaintiff's impairments as discussed *supra*, section V.A., provided

---

**20.** There is substantial non-medical evidence that plaintiff could not ambulate effectively, given his claims of the limitations caused by his impairments. In particular, his testimony stating that it takes about a half an hour to walk one block is telling, as is his description of how he uses the stairs. Additionally, there is evidence that his activities of daily living are thus severely limited. The Commissioner argued in her brief that the ALJ appropriately considered the credibility of plaintiff's subjective allegations. However, the ALJ's opinion demonstrates that the only assessment he made as to plaintiff's credibility dealt strictly with plaintiff's pain. Moreover, he did not apply the two step process required in this circuit for assessing the credibility of a claimant's pain. *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir.1996) (remanding because the ALJ did not expressly consider the threshold question of whether the claimant had demonstrated an impairment capable of causing the degree and type of pain alleged). *See also* 20

C.F.R. § 1529. The undersigned also notes that the ALJ's pain analysis, which articulated three reasons for finding plaintiff's allegations of pain not totally credible, is based on at least one factually incorrect assertion. The ALJ stated that "[t]he claimant has taken only over-the-counter medication to relieve pain, and in February 2001 was reportedly taking no pain medication, in spite of the allegations of quite limiting pain." (R. 12, ¶ 3). However, the record demonstrates that plaintiff was taking Vicodin, a prescription pain medication, on a number of occasions. Additionally, while the ALJ is correct in asserting that he was not taking pain medication at the time of Dr. Weiss's February 2001 report, plaintiff had reported side effects from taking Vicodin, although this was not discussed or inquired into by the ALJ. Finally, the ALJ failed to discuss the fact that plaintiff testified he was taking as much as 2400 milligrams of pain medication per day, albeit non-prescription, at the time of the hearing.

that a claimant's fracture must be of the femur, tibia, tarsal bone or pelvis "with solid union not evident on X-ray and not clinically solid, when such determination is feasible." Second, the listing also required that "return to full weight-bearing status did not occur or is not expected to occur within 12 months of onset." The ALJ noted that the X-rays of plaintiff's tibia fracture "show that there is good fixation that is essentially anatomic as of November 29, 2000, within 5 months of the injury." (R. 11). However, the ALJ provided no explanation as to why plaintiff was expected to return to full weight-bearing status within twelve months, particularly in light of the fact that Dr. Weiss noted on December 20, 2000 that plaintiff still required intermittent use of a walker and constant use of a cane, and that as of February 5, 2001, plaintiff still required use of a cane. Regardless, as the X-rays apparently revealed solid union, the ALJ correctly found that plaintiff's tibia fracture did not meet the first criterion of Listing 1.11, which is substantially similar to its parallel criterion in Listing 1.06.

Nonetheless, the undersigned finds that the ALJ failed to fully consider all relevant factors, specifically plaintiff's extreme obesity, in finding that his impairments did not meet or equal Listing 1.11 at step three, even assuming that had been the applicable listing, and in assessing his residual functional capacity at step four. At the time of his accident, the record reflects that plaintiff weighed 325 pounds, while at the time of the hearing he weighed 350 pounds. Dr. Weiss diagnosed plaintiff with obesity and noted that it complicated his examinations. Accordingly, the ALJ found at step two that plaintiff's obesity was a severe impairment. Moreover, the agency classifies plaintiff's particular level of obesity as "extreme." The ALJ failed, however, to discuss and apparently even to consider this impairment at steps three and four.

The ALJ is required to assess the combined effect of a claimant's impairments throughout the five-step analytical process. 20 C.F.R. § 404.1523; *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir.1989). Specifically, the regulations provide that the ALJ "will consider the combined effect of all of [claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523; *Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir.1986) (remanding due to ALJ's failure to evaluate claimant's mental impairments in combination with her arthritis); *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir.1989) (remanding due to ALJ's failure to "analyze the cumulative effect the impairments had on the claimant's ability to work").

The regulations specifically require the ALJ to consider the effects of obesity at steps three and four when combined with his tibial fracture. Section 1.00Q of the LOI provides that "when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2002).

Although Social Security Ruling 00–3p[21] does not provide precise height and weight requirements for obesity, it states that for male and female adults a body mass index of 25–29.9 is overweight while one above

---

21. SSR 00–3p was superseded by SSR 02–01p on September 12, 2002. 2000 WL 628049 at *1 (S.S.A.2002). However, SSR 00–3p was in effect at the time of the ALJ's decision, and thus is the ruling applicable to this case.

30 is obese. 2000 WL 33952015, at *2 (S.S.A.2000). The record reflects that plaintiff's height is 5 feet, 7 inches and his weight at the time of the hearing was 350 pounds. While plaintiff's body mass index ("BMI") was not computed in the record, it is easily done.[22] Plaintiff's BMI is 54.8. The SSR classifies a BMI greater than or equal to 40 as "extreme" obesity, further noting that this classification represents the greatest risk for developing obesity-related impairments. *Id.*

At step three, "equivalence [will be found regarding a listed impairment] if an individual has multiple impairments, including obesity, no one of which *meets* or equals the requirements of a listing, but the combination of impairments is *equivalent in severity* to a listed impairment." *Id.* at *5. Specifically, "if the obesity is of such a level that it markedly limits the individual's ability to walk and stand, it may substitute [for specific musculoskeletal listing criteria] ... and we will then make a finding of equivalence." *Id.*

At step four, evaluation of obesity is important in assessing residual functional capacity, as obesity, particularly when combined with a musculoskeletal impairment, may cause more serious limitations in any of the exertional functions, such as standing and walking, and postural functions, such as climbing stairs and ramps, balancing, bending and crouching, than would be caused by the listing impairment alone. *Id.* at *6. The ruling further notes that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity ... [as where] someone with obesity and [a musculoskeletal impairment] affecting a weight-bearing joint may have more pain and limitation than might be expected from the [musculoskeletal impairment] alone." *Id.* Finally, the ruling specifies that the ALJ must explain how conclusions regarding a claimant's obesity were reached. *Id.*

The ALJ, having found obesity a severe impairment at step two, merely stated at step three that plaintiff's fracture and obesity impairments, while severe, were not severe enough to meet or medically equal any of the listing impairments. Specifically, the ALJ concluded that because the criteria of Listing 1.11 were not met plaintiff's impairments were "not severe enough to meet or medically equal" the listing. (R. 11).

▉ With that conclusory statement, and no other explanation whatsoever, the ALJ moved on to step four, where, in determining plaintiff's RFC, he simply made no mention whatever of plaintiff's extreme obesity which he had found severe at step two, or in fact of any of the evidence regarding plaintiff's functional limitations, other than an erroneous [23] passing reference to the "residual functional capacity conclusions reached by the [non-examining DDS physicians]" and which he did not adopt in any case, simply announcing his findings without further explanation. (R. 12, ¶¶ 5–6). The ALJ's determination of plaintiff's RFC in this case is completely insufficient. An RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence." Soc. Sec. Rul. 96–8p, 1996 WL 374184, at *6 (S.S.A.1996). *See also*

---

22. Body mass index is calculated by dividing an individual's weight by the square of their height and then multiplying the resulting sum by 703. National Center for Chronic Disease Prevention and Health Promotion, *Body Mass Index Calculator* (August 1, 2003), *available at* http://www.cdc.gov/nccdphp/dnpa/bmi/calc-bmi.htm.

23. Only one, not both, of the non-examiners completed an RFC. (R. 134–141).

42 U.S.C. § 405(b)(1) (requiring the ALJ to provide reasons for any decision); 5 U.S.C. § 557(c)(3) (requiring decisions to include "a statement of findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record"); *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

The ALJ found correctly that plaintiff's obesity was a severe impairment at step two. Nonetheless, the ALJ offered no explanation as to why he did not consider plaintiff's obesity at steps three and four of the evaluation process. Additionally, the ALJ simply did not explain overall how he evaluated the evidence of record in assessing plaintiff's RFC.

■ The Fourth Circuit has concluded that failure by the ALJ to explain a decision makes it "simply impossible to tell whether there was substantial evidence to support the determination." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir.1985); *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir.1980). If an ALJ fails to explain his findings, as the undersigned finds happened here, "to say that his decision is supported by substantial evidence approaches an abdication of the Court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir.1997). Thus, the incomplete explanation in this case is, as a matter of law, insufficient to meet what is required under the Act and supporting case law and does not enable this Court to determine if the ALJ's opinion is supported by substantial evidence. *Cook*, 783 F.2d at 1173. *See also Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir.1996) (remanding because the ALJ "merely stated a summary conclusion that [claimant] was not disabled at step three").

## C. *The ALJ Had a Heightened Duty to Develop the Factual Record, as the Claimant Was Unrepresented, that was Unfulfilled.*

■ It is well understood that it is the ALJ's obligation to develop the record. The case law clearly imposes on an ALJ a duty to develop the record, rather than rely on only the evidence submitted by the claimant, *even if the claimant is represented.* "[T]he ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.1986). Moreover, evidentiary gaps that result in unfairness or clear prejudice require a remand. *Brown v. Shalala*, 44 F.3d 931, 935–36 (11th Cir.1995); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir.1980). The ALJ is permitted to develop the record in several ways, including questioning witnesses, requesting evidence, and subpoenaing witnesses. 20 C.F.R. §§ 404.944, 404.950(d). Additionally, the ALJ may request the claimant, at the Social Security Administration's expense, to obtain medical evidence. This includes arranging physical examinations or tests for the claimant if the claimant's own medical source cannot or will not provide sufficient medical evidence. 20 C.F.R. §§ 416.914, 416.917.

■ While a lack of representation by counsel is not by itself an indication that a hearing was not full and fair, the ALJ has a *heightened duty* in cases involving *unrepresented* claimants, as in this case, to develop the factual record. The Fourth Circuit has held that when a claimant is not represented, the ALJ is under a heightened duty to ensure that all the facts of the case are fully explored, and that a failure on the part of the ALJ to perform this duty may result in prejudice to the

claimant, thus requiring the case to be remanded for further proceedings. *Walker v. Harris,* 642 F.2d 712, 714 (4th Cir. 1981) (holding that the ALJ failed in her duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts in a case involving an unrepresented, poorly educated, pro se claimant); *Sims v. Harris,* 631 F.2d 26, 27–28 (4th Cir.1980); *Marsh v. Harris,* 632 F.2d 296, 299 (4th Cir.1980).

Additionally, other circuits have held that, in cases involving pro se claimants, reviewing *courts* also have a heightened duty to make a searching investigation of the record to ensure that the claimant's rights have been adequately protected. *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980); *Gold v. Sec'y of Health, Educ. & Welfare,* 463 F.2d 38, 43 (2d Cir. 1972) (stating that it felt particularly compelled to make such an investigation in cases where the attitude of the hearing examiner did not measure up to the examiner's statutory duty to scrupulously and conscientiously develop all the relevant facts); *Miracle v. Celebrezze,* 351 F.2d 361, 382–83 (6th Cir.1965).

On review, there are serious gaps in the plaintiff's medical records. While plaintiff was either hospitalized or an inpatient at a nursing or rehabilitative facility for over five months after his accident, there are no surgical, in-patient, or nursing or rehabilitative facility records before the Court.

The fact that follow-up reports from plaintiff's orthopaedist, Dr. Weiss, are in the record, is insufficient to remedy this deficiency, given that the seriousness of both plaintiff's fracture and the treatment for it, as well as his long-term prognosis, are central to his disability claim. Moreover, the regulations governing evaluation of musculoskeletal claims, as in the instant case, require that "[w]hen surgical procedures have been performed, documentation should include a copy of the operative notes and available pathology reports." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00P. Not only are there no operative notes or pathology reports regarding plaintiff's leg surgery in the record, there are no records from Suburban Hospital *at all,* other than a gastric biopsy pathology report, for the entire month he was hospitalized there. It is rather unlikely, to understate the matter, that their absence from the record is because they do not exist. The follow-up reports from Dr. Weiss are somewhat cursory; although they reflect that plaintiff's condition had certainly improved, these reports also assume familiarity with the surgery and treatment described in the missing records, which, of course, neither this Court nor the ALJ have. Without having a clearer picture of the course of plaintiff's actual surgical procedure, lengthy treatment and ultimate prognosis, which the missing records would undoubtedly provide, it is difficult to evaluate Dr. Weiss's reports properly in their full context. Therefore, particularly under the heightened standard applicable to this case, the ALJ should have developed the record by obtaining these records, or at least by advising the plaintiff that he should do so and leaving the record open.

Additionally, the ALJ stated in his opinion that "[t]he record reflects *no* physical therapy, despite the treating physician's recommendation that therapy was needed." (R. 12) (emphasis added). First, this statement is factually incorrect. The record indicates that plaintiff received aqua therapy at the nursing and rehabilitative facility. (R. 131). More importantly, Dr. Weiss noted, on September 22, 2000, that plaintiff was "beginning to get motion now out of the fixator [and][i]s getting therapy for this." (R. 132). At the time of this particular report, as noted *supra,* section II.A.1, the records indicate that plaintiff was an in-patient at a rehabilitative facility. Therefore, if he was receiving therapy,

as Dr. Weiss stated that he was at that time, it is logical to assume that he was receiving it at that facility. Moreover, it also seems likely that plaintiff's therapeutic progress, or lack thereof, would be documented extensively in the rehabilitative facility treatment records. Additionally, it also seems probable that the presence or absence of complicating factors interfering with therapy, such as pain and obesity, are documented in those records. Finally, physical therapists often document any indications of malingering or lack thereof. Clearly, the rehabilitative facility records would be extremely probative in evaluating whatever therapy was offered, attempted, refused, successful, or unsuccessful for the approximately three month period following removal of the fixator while plaintiff was still an in-patient at that facility. Therefore, particularly under the heightened standard applicable to this case, the ALJ should have developed the record by obtaining these records, or at least by advising the plaintiff that he should do so and leaving the record open.

While plaintiff seemingly acknowledged at the hearing that he had not received any special therapy since he had been discharged from the rehabilitative center, he indicated that he was doing, or attempting to do, the exercises recommended by Dr. Weiss as he understood them. Notably, the ALJ did not ask any rather obvious follow-up questions at the hearing that might have clarified the matter, regarding any pain caused by the exercises, any difficulties that plaintiff's obesity might have caused in doing such exercises, transportation or logistical difficulties plaintiff may have encountered in attempting to travel to a therapist, or financial or medical coverage problems related to receiving therapy. Therefore, particularly under the heightened standard applicable to this case, the ALJ should have developed the record by inquiring more thoroughly into these matters at the hearing.

Significantly, although the ALJ's opinion apparently placed considerable weight on the fact that Dr. Weiss had recommended therapy, and that plaintiff allegedly failed to obtain or do any therapy, there is no information in the record that indicates what this therapy should comprise, what its anticipated outcome is, other than improved range of motion to an unspecified degree, or most importantly, how it might affect plaintiff's functional abilities. Therefore, particularly under the heightened standard applicable to this case, the ALJ should have developed the record by re-contacting Dr. Weiss to determine what the recommended therapy comprised and what outcome might be anticipated. 20 C.F.R. § 404.1512(e)(1).

Additionally, the Fourth Circuit has held, regardless of whether a claimant is pro se or not, that the Commissioner bears the burden of producing evidence that the condition is remediable by treatment and that the claimant, without good cause, refuses to follow the treatment. *Preston v. Heckler,* 769 F.2d 988, 990 (4th Cir.1985). As a matter of law, in order for benefits to be denied based on noncompliance, in full or in part, the Commissioner must conduct a particularized inquiry and develop a record establishing by substantial evidence that the claimant's impairment is reasonably remediable by the claimant given the claimant's particular situation *and* that the claimant lacks good cause for failing to follow a prescribed treatment program. *Id.* Therefore, it appears that the ALJ not only failed to fulfill the heightened duty required in this case to develop the record, but also inappropriately assumed both that plaintiff's impairments were reasonably remediable by plaintiff and that plaintiff lacked good cause for the alleged noncompliance. *Id.* (requiring that if noncompliance is ultimately to be used as a basis for denying

benefits it must be found on the basis of a "particularized inquiry"). *See also Futrell v. Shalala,* 852 F.Supp. 437, 441 (E.D.N.C. 1994) (noting that Social Security Ruling 82–59 requires that before a claimant is denied benefits for failure to follow prescribed treatment he will be "afforded an opportunity to show justifiable cause for failing to do so" and that before a determination is made plaintiff "will be informed of this fact and of its effect on eligibility for benefits").

■■■ Finally, the Commissioner correctly asserts that the ALJ was not required to accord Dr. Weiss's opinions of June 25 and July 2, 2001 that plaintiff could not work controlling weight, as the ultimate issue of disability is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Additionally, a treating physician's opinion need not be accorded controlling weight if it is inconsistent with other evidence in the record, and Dr. Weiss's later opinion was inconsistent with his previous notation, albeit also on an issue reserved to the Commissioner, that plaintiff could do sedentary work. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir.2001). Dr. Weiss should have specified the basis for his opinion. However, under the heightened duty applicable in this case, it was incumbent upon the ALJ to develop the record to resolve the ambiguity or conflict caused by these two reports, particularly as Dr. Weiss is not only plaintiff's treating physician, but because his reports are the *only* medical evidence in the rec-

ord from an examining source, aside from the Montgomery Hospital records from the day of plaintiff's accident and the gastric biopsy report. 20 C.F.R. § 404.1512(e)(1) (stating that the agency must re-contact a treating physician when medical reports contain a conflict or ambiguity that must be resolved or the report does not contain all the necessary information).

The earlier reports by Dr. Weiss, on which the Commissioner relies in her brief, do demonstrate that plaintiff's fractures were healing and that his extension and flexion were much improved. However, the latest follow-up report, dated February 5, 2001, also demonstrates that plaintiff's mobility was still severely restricted, as he was using a cane on a regular basis and had to use a walker intermittently. Aside from the analysis at step three, Dr. Weiss's opinions as to plaintiff's mobility, and the medical basis for them or lack thereof, should have been sought in order to properly assess plaintiff's RFC at step four.

In any case, Dr. Weiss's opinions that plaintiff was permanently disabled were based on an examination that he conducted on June 25, 2001, over four months after he opined that plaintiff could do sedentary work. It is entirely possible that Dr. Weiss, based on the June 25 examination, found new medical evidence on which to base his changed opinion, although the form reports do not elaborate.[24] Again, for the reasons stated previously, the ALJ

---

24. On a final note, it cannot be asserted accurately that all of the evidence of record, including plaintiff's activities, is counter to Dr. Weiss's latest opinion. The recitation of plaintiff's activities of daily living in the Commissioner's brief is materially incomplete. A review of plaintiff's disability reports and his testimony at the hearing, as well as Dr. Weiss's follow-up reports, consistently reveal significant mobility restrictions that seriously and adversely affected those activities. As to

the particular household chores plaintiff reported doing at one point that are referred to in the Commissioner's brief, plaintiff also noted on the same page that he needed the assistance of his children to accomplish them and that they took "a lot longer" to complete. (R. 106). In any case, the ALJ did not even mention plaintiff's activities of daily living, or any of his testimony in that regard, in his opinion.

should have developed the record by obtaining the treatment notes from the June 25 examination.

■ The Commissioner has no duty to insist that a claimant have counsel. *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir.1980). The fact that plaintiff was not represented by counsel is not in itself reason to reverse the Commissioner's decision denying benefits. However, where absence of counsel creates clear prejudice or unfairness to claimant, a remand to the Secretary is proper. *Sims v. Harris*, 631 F.2d 26, 27–28 (4th Cir.1980). As discussed *supra*, all of the missing records and lack of factual development are important to plaintiff's case. In particular, because the ALJ explicitly found the issue of therapy significant, it is clear plaintiff was prejudiced by lack of counsel, as counsel could have obtained the missing records, elicited more information from plaintiff at the hearing, attempted to re-contact Dr. Weiss for clarification, and sought permission for the record to be left open so additional evidence could have been procured. Additionally, while the ALJ should have re-contacted Dr. Weiss to resolve the conflict in his opinions about plaintiff's ability to work in any case, counsel could have assisted plaintiff in this regard as well. Therefore, even though a record may contain substantial evidence to support the Commissioner's decision, the court may still remand for the taking of additional evidence when the ALJ has failed to explore all relevant facts and where the absence of counsel appears to have prejudiced a pro se claimant. *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir.1980).

## VI. *Conclusion*

In light of these findings, it is the conclusion of the undersigned that the ALJ's decision was reached through errors of law. Therefore, it is recommended that the case be remanded.